**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<u>**FOR PUBLICATION**</u>

--------------------------------------------------------X

In re:

Justo Reyes,

                       Debtor.

--------------------------------------------------------X

In re:

Karen Jackson,

                       Debtor.

--------------------------------------------------------X

In re:

Janet Berger,

                       Debtor.

--------------------------------------------------------X

In re:

Anastasia Cretekos,

                       Debtor.

--------------------------------------------------------X

In re:

Frank Occhipinti,

                       Debtor.

--------------------------------------------------------X

In re:

Richard Graham Watson,

                       Debtor.

--------------------------------------------------------X

In re:

Douglas Kramer,

                       Debtor.

--------------------------------------------------------X

Chapter 13

Case No. 16-22556 (CGM)


Chapter 13

Case No. 16-23514 (CGM)


Chapter 13

Case No. 17-22921 (CGM)


Chapter 13

Case No. 18-22239 (CGM)


Chapter 13

Case No. 18-22690 (CGM)


Chapter 13

Case No. 18-22923 (CGM)


Chapter 13

Case No. 18-22940 (CGM)

-------------------------------------------------------X

In re:

Charmaine J. Brown,

                  Debtor.

-------------------------------------------------------X

In re:

Janice K. Desmond,

                  Debtor.

-------------------------------------------------------X

In re:

Suzanne M. Faupel,

                  Debtor.

-------------------------------------------------------X

In re:

Christopher Rocco Gizzo,

                  Debtor.

-------------------------------------------------------X

In re:

John Kolkowski,

                  Debtor.

-------------------------------------------------------X

In re:

Catherine R. Pelle,

                  Debtor.

-------------------------------------------------------X

In re:

David Daniel Akerib,

                  Debtor.

-------------------------------------------------------X

Chapter 13

Case No. 18-23036 (CGM)

Chapter 13

Case No. 18-23750 (CGM)

Chapter 13

Case No. 19-22007 (CGM)

Chapter 13

Case No. 19-22051 (CGM)

Chapter 13

Case No. 19-22172 (CGM)

Chapter 13

Case No. 19-22229 (CGM)

Chapter 13

Case No. 19-22276 (CGM)

```
----------------------------------------------------X
In re:
                                                        Chapter 13

Sarah Frankel,
                                                        Case No. 19-22281 (CGM)

                        Debtor.
----------------------------------------------------X
In re:
                                                        Chapter 13

Malka Farkas,
                                                        Case No. 19-22520 (CGM)

                        Debtor.
----------------------------------------------------X
In re:
                                                        Chapter 13

Blossom Joyce Consingh,
                                                        Case No. 19-23034 (CGM)

                        Debtor.
----------------------------------------------------X
```

## MEMORANDUM OF DECISION AND ORDER

**A P P E A R A N C E S :**

**WILLIAM K. HARRINGTON**
*United States Trustee for Region 2*
Alexander Hamilton Customs House
One Bowling Green
New York, New York 10004
By:    Andrew D. Velez-Rivera, Esq.
       Linda A. Riffkin, Esq.
       Mark E. Bruh, Esq.

**KRISTA PREUSS**
*Standing Chapter 13 Trustee, S.D.N.Y.*
399 Knollwood Road, Suite No. 102
White Plains, New York, 10603
By:    Krista Preuss, Esq.
       Dennis Jose, Esq.

**THE WIEDERKEHR LAW GROUP, P.C.**
*Counsel for Linda Tirelli, Esq.*
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
By:    Evan Wiederkehr, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the *Order to Show Cause Why Court Should Not Sanction Counsel*

[ECF No. 112][1] (the "OSC"), issued by the Court against Linda M. Tirelli, Esq., counsel to the

debtors in each of the above-captioned Chapter 13 cases (collectively, the "Debtors").[2]  The OSC

is based on Ms. Tirelli's representations to the Court that postpetition mortgage payments on the

Debtors' real property were being held in escrow by Ms. Tirelli for the ultimate benefit of

creditors, when, in fact, such amounts were not routinely being escrowed in a significant number

of cases.  *See* OSC at 3-5.

With respect to the disposition of the OSC, the Office of the United States Trustee (the

"UST") and the Standing Chapter 13 Trustee for the Southern District of New York (the

"Chapter 13 Trustee") have recommended that the Court sanction Ms. Tirelli and refer her to the

state and federal bar grievance committees for her actions with respect to the Debtors' cases.  *See*

*Recommendation of United States Trustee, William K. Harrington, Re: Order to Show Cause*

*Why Court Should Not Sanction Counsel* [ECF No. 176] (the "UST Recommendation");

*Aff. with Citation to Legal Auth. with the Chapter 13 Trustee's Recommendations* [ECF No. 180]

(the "Chapter 13 Trustee Recommendations").  The UST and the Chapter 13 Trustee have also

requested that the Court unseal the record with respect to the OSC, which was originally placed

under seal at the request of Ms. Tirelli.  *See Mot. of United States Trustee, William K.*

*Harrington, to Unseal Recommendation  Re: Order to Show Cause Why Ct. Should Not Sanction*

---

[1]    Unless otherwise indicated, references in this Memorandum of Decision to docket entries on the Case Management/Electronic Case Files ("ECF") system are to Case No. 16-22556.  As the relevant pleadings filed in each of the above-captioned cases are substantively identical with respect to the legal issues, the Court will cite only to the pleadings filed in Case No. 16-22556, unless otherwise necessary to distinguish between the facts of the cases.

[2]    While the Debtors' Chapter 13 cases have been reassigned to Judge Cecelia Morris, the undersigned Judge has retained jurisdiction in each of the cases to adjudicate the issues raised by the OSC.

*Counsel Pursuant to 11 U.S.C. § 107* [ECF No. 177] (the "Motion to Unseal"); *Aff. of Joinder*

[ECF No. 181]. For the reasons discussed below, the Court grants the Motion to Unseal, as the

information relating to these proceedings should be in the public record consistent with the

policy of transparency in court proceedings. As to the merits of the OSC, the Court concludes

that Ms. Tirelli's conduct violates applicable state law ethics rules governing attorney escrow

accounts and that she lacked candor in her representations to the Court. Based on these findings,

the Court refers Ms. Tirelli to the Committee on Grievances for the United States District Court,

S.D.N.Y. for any appropriate discipline.

## **BACKGROUND**

### A. **Facts Leading to Issuance of the OSC**

The representations that led to the issuance of the OSC were contained in Chapter 13

plans filed by Ms. Tirelli in the Debtors' cases and were subsequently repeated verbally to the

Court in multiple Chapter 13 hearings. *See* OSC at 3 & n.1.[3] In these Chapter 13 plans, Ms.

---

[3]     The caption of this Memorandum of Decision includes all the cases in which the Court was aware at the
time it issued the OSC that such a representation has been made. This list was not necessarily comprehensive, and it
also included cases where postpetition mortgage payments were no longer a relevant issue, such as where the
property underlying the mortgage had been sold or where the case had been dismissed. The Court did not exclude
those cases from the list based on such circumstances, however, in order to illustrate the wide scope of this practice
by Ms. Tirelli.

As set forth in the Court's OSC, the cases at issue include the following:

- *In re Justo Reyes*, Case No. 16-22556, Chapter 13 Plan at Section D, Category 2(b) [ECF No. 13] ("$3300 to be held aside monthly pending judicial determination of real party in interest and amount of debt owed if any");
- *In re Karen Jackson*, Case No. 16-23514, Chapter 13 Plan at Section D, Category 2(b) [ECF No. 4] ("Respective Post Petition Payments to each purported lien holder are to be held aside in escrow pending judicial determination of the identity of the real party in interest and amount owed (if any) Per Contract");
- *In re Janet Berger*, Case No. 17-22921, Chapter 13 Plan at Section D, Category 2(b) [ECF No. 22] ("$3200.00 To be Held aside Pending verification of amount owed (if any) and real party in interest"); *but see* amended Chapter 13 Plan at Section 3.2(a) [ECF No. 43] (listing mortgage as disputed and referring to varying provisions with respect to postpetition mortgage payments, though varying provisions does not address mortgage payments); Order Dismissing Case [ECF No. 62];
- *In re Anastasia Cretekos*, Case No. 18-22239, Chapter 13 Plan at Section 3.2(a) [ECF No. 8] (stating that $4000 monthly postpetition payments to secured creditor to be sent to "c/o Tirelli & Wallshein Trust");

- *In re Frank Occhipinti*, Case No. 18-22690, Chapter 13 Plan at Section 3.2(a) [ECF No. 11] (stating that $4300 monthly postpetition payments to secured creditor to be sent to "c/o Tirelli & Wallshein IOLA Acct pending judicial determination of validity of lien and real party in interest");

- *In re Richard Graham Watson*, Case No. 18-22923, Chapter 13 Plan at Section 3.2(a) [ECF No. 9] (stating that $2127.83 monthly postpetition payments to secured creditor "[t]o be held IN ESCROW with Tirelli & Wallshein, LLP"); *but see* amended Chapter 13 Plan at Sections 1.3 and 3.2 [ECF No. 80] (noting that plan has been amended to reflect anticipated sale of house and listing no postpetition mortgage payments);

- *In re Douglas Kramer*, Case No. 18-22940, Chapter 13 Plan at Section 8.6 [ECF No. 10] ("Debtor's postpetition mortgage payments to be held IN ESCROW with Tirelli & Wallshein, LLP IOLA account pending timely filed claim and verification of nture [sic] and extent of lien, amount owed and identity of real prty [sic] in interest."); *but see* amended Chapter 13 Plan at Sections 3.2(a) and 8.6 [ECF No. 30] (with respect to postpetition mortgage payments, referring to varying provisions, which state that "Debtor shall negotiate a short payoff of the mortgage on his primary residence via the court's loss mitigation program . . . .");

- *In re Charmaine J. Brown*, Case No. 18-23036, amended Chapter 13 Plan at Section 8.6 [ECF No. 20] ("Post-petition mortgage payments alleged by disputed creditors in the respective amounts of $2297.77 and $884.30 monthly to be held in escrow with Tirelli & Wallshein, LLP pending judicial determination as to nature and extent of lien (if any) and identity of real party in interest.") (case dismissed at hearing held on June 16, 2021, but Court stating on record that it was retaining jurisdiction with respect to issues relating to the escrow);

- *In re Janice K. Desmond*, Case No. 18-23750, Chapter 13 Plan at Section 8.6 [ECF No. 12] (noting with respect to two properties that monthly postpetition payment to secured creditors in the amounts of $2000 and $1600 "shall be held in escrow with the Debtor's attorney, pending determination as to the identity of the real party in interest and amount owed (if any) at which time the funds will be transferred to the verified creditor as adequate protection.");

- *In re Suzanne M. Faupel*, Case No. 19-22007, Chapter 13 Plan at Section 8.6 [ECF No. 11] ("Post petition mortgage payments alleged by disputed creditor Flagstar Bank in the amount of $3500.00 monthly to be held in escrow with Tirelli Law Group LLC pending judicial determination as to nature and extent of lien (if any) and identify [sic] of real party in interest.") (case dismissed at hearing held on June 2, 2021, but Court stating on record that it was retaining jurisdiction with respect to issues relating to the escrow);

- *In re Christopher Rocco Gizzo*, Case No. 19-22051, Chapter 13 Plan at Section 8.6 [ECF No. 9] ("Post petition monthly payments in the amount of $4500.00 shall be held in escrow with the Debtor's attorney, pending determination as to the identity of the real party in interest and amount owed (if any) at which time the funds will be transferred to the verified creditor as adequate protection.");

- *In re John Kolkowski*, Case No. 19-22172, Chapter 13 Plan at Section 8.6 [ECF No. 10] ("Post petition monthly payments in the amount of $2707.91 shall be held in escrow with the Debtor's attorney, pending determination as to the identity of the real party in interest and amount owed (if any).");

- *In re Catherine R. Pelle*, Case No. 19-22229, Chapter 13 Plan at Section 8.6 [ECF No. 7] ("Post petition mortgage payments alleged by disputed creditor Ditech in the amount of $2700.00 monthly to be held in escrow with Tirelli Law Group LLC pending judicial determination as to nature and extent of lien (if any) and identity of real party in interest."); *but see* amended Chapter 13 Plan at Sections 1.3 and 3.2(a) [ECF No. 48] (noting that plan has been amended to reflect trial loan modification and providing for postpetition mortgage payments directly to secured creditor);

- *In re David Daniel Akerib*, Case No. 19-22276, Chapter 13 Plan at Section 8.6 [ECF No. 11] ("Post petition monthly payments in the amount of $2400.00 shall be held in escrow with the Debtors' attorney, pending determination as to the identity of the real party in interest and amount owed (if any) on the secured portion of the first mortgage lien.");

- *In re Sarah Frankel*, Case No. 19-22281, Chapter 13 Plan at Section 8.6 [ECF No. 8] ["Post petition monthly payments in the amount of $3956.00 shall be held in escrow with the Debtor's attorney, pending determination as to the identity of the real party in interest and amount owed (if any) on the secured portion of the first mortgage lien."); *but see* amended Chapter 13 Plan at Sections 1.3 and 8.6 [ECF No. 55] (noting that plan has been amended to incorporate terms of order determining amount of secured claim and to increase payments to pay secured creditor through the plan);

6

Tirelli—as Debtors' counsel—identified herself as acting as an escrow agent to hold the

Debtors' postpetition monthly mortgage payments in these Chapter 13 cases where the Debtor

had raised issues with the validity of the secured creditors' lien on the property.  *See id*.  In light

of issues raised about these liens, the Chapter 13 plans filed by Ms. Tirelli for her clients

provided that the postpetition payments to the mortgage lenders would be held by her in escrow

rather than being paid directly to secured creditors or the Chapter 13 Trustee.  *See id*.

Upon taking over the Chapter 13 calendar in May 2019, the Court expressed its clear

reservations regarding the escrow procedures established by Ms. Tirelli in the Debtors' plans.

*See, e.g., In re Jackson*, Case No. 16-23514, Hr'g Tr. 5:2-7:12 (May 8, 2019) [ECF No. 142]

(noting, among other things, that simply because loss mitigation is pending or allegations

regarding validity have been made does not relieve a debtor from their obligation to make

postpetition mortgage payments).[4]  But the Court understood that these procedures had been put

in place prior to the transfer of the Chapter 13 calendar to the undersigned Judge, and therefore

allowed them to continue.  *See, e.g., Attorney Declaration of Linda Tirelli*, dated September 20,

2021 ¶ 4 (the "Attorney Declaration") [ECF No. 139-1] (stating that procedures were put in place

years before "with the knowledge, consent and actual direction of Judge Robert Drain. . . .");

---

- *In re Malka Farkas*, Case No. 19-22520, Chapter 13 Plan at Section 8.6 [ECF No. 10] ("Until such time as th [sic] parties can resolve the issue of amount owed and identity of the real party in interest, post petition monthly payments in the amount of $3300.00 shall be held in escrow with the Debtor's attorney, pending determination as to the identity of the real party in interest and amount owed (if any) on the secured portion of the first mortgage lien.");
- *In re Blossom Joyce Consingh*, Case No. 19-23034, Chapter 13 Plan at Section 3.2(a) [ECF No. 24] (providing for postpetition mortgage payments "per Doc#2"); *but see* amended Chapter 13 Plan at Sections 1.3 and 3.2(a) [ECF No. 52] (noting that plan has been amended to incorporate terms of loan modification and providing for payments directly to secured creditor).

*See* OSC at 3-5 n.1.

[4]     Loss mitigation is a "forum for debtors and lenders to reach consensual resolution whenever a debtor's residential property is at risk of foreclosure."  Loss Mitigation Program Procedures at 1, United States Bankruptcy Court, S.D.N.Y., available at http://www.nysb.uscourts.gov/loss-mitigation, last visited April 28, 2023.

*Affirmation of Counsel to Linda Tirelli with Citation to Legal Authority in Opposition to Recommendations of Chapter 13 Trustee and United States Trustee*, dated August 1, 2022 ¶ 51 (noting that "the escrow practice . . . had been in place for years before this Court began to oversee the subject cases.").  Due to its reservations, however, the Court made clear that these procedures would be limited to circumstances where there was a challenge to the validity of the mortgage.  *See, e.g., In re Akerib*, Case No. 19-22276, Hr'g Tr. 5:19-24 (Aug. 28, 2019) [ECF No. 29] (in response to inquiry of secured creditor regarding use of the escrow procedures, the Court noted that "we shouldn't do that unless there's actually been something filed that calls into question the validity of the actual noteholder.  And so if there's an adversary, there's a claim objection, but as a general practice, no we—that should—that money should come out of escrow.").

During the course of subsequent Chapter 13 hearings in June 2021, it came to the Court's attention that funds were not being escrowed in numerous cases as required by the terms of these Chapter 13 plans, nor were they being remitted to the Chapter 13 Trustee for the benefit of creditors or paid directly to the secured creditors as required by the Bankruptcy Code.  *See* OSC at 3-5.

## B. Issuance of the OSC and the Initial Response

On June 17, 2021, the Court issued the OSC in the Debtors' cases.  *See generally* OSC. The OSC directed Ms. Tirelli to show cause as to:

(i) whether misrepresentations were made by Ms. Tirelli—or other counsel on her behalf—regarding the escrowing of postpetition mortgage payments and, if so, why Ms. Tirelli should not be sanctioned for such misrepresentations,

(ii) whether all postpetition mortgage payments purportedly held in escrow by Ms. Tirelli in the above-captioned cases should not be immediately turned over to the applicable secured creditors or the Chapter 13 Trustee, [and]

(iii) why the Chapter 13 Plans in each of the above-captioned cases—and any
other cases where Ms. Tirelli is counsel and the plans provide for the escrow of
postpetition mortgage payments—should not be immediately amended to require
that all postpetition mortgage payments be paid either directly to the secured
creditors or paid to the Chapter 13 Trustee as conduit payments to the secured
creditors.

*Id.* at 5-6.  The OSC further directed Ms. Tirelli to file a declaration by July 14, 2021 providing

the following information:

1) a calculation of the amount of funds that are being held in escrow for
postpetition mortgage payments in each of the above-captioned cases and any
other cases where Ms. Tirelli has represented to the Court that she (or her law
firm) is holding such funds;

2) an accounting of how the funds actually held in escrow by Ms. Tirelli (or her
law firm) compares with the amount that should be in escrow given the length of
time that these bankruptcy cases have been pending[;] and

3) to the extent that the funds actually held in escrow do not match the amount
that should have been in escrow based on representations made to the Court, an
explanation as to why such a circumstance does not constitute sanctionable
conduct.

*Id.* at 6-7.  The OSC set a hearing date of August 4, 2021.  *See id.* at 5.

At Ms. Tirelli's request, the Court granted an extension of time to file the declaration

required by the OSC and rescheduled the hearing to a later date.  *See Letter from Ms. Tirelli*,

dated June 30, 2021 [ECF No. 115]; *Order Adjourning Order to Show Cause* at 3-4 (the

"Adjournment Order") [ECF No. 116].  But given concerns about the status of funds in the

Debtors' cases, the Court further ordered that:

within two weeks of the date of entry of this Order, each of the Chapter 13 Plans
filed in the above-captioned cases shall be amended to replace any language
regarding the escrow of postpetition mortgage payments with Ms. Tirelli or her
law firm with language providing that all future postpetition mortgage payments
shall be paid either directly to the secured creditors or to the Chapter 13 Trustee
as conduit payments to the secured creditors . . . [and] that by August 4, 2021, Ms.
Tirelli shall provide the Court with a comprehensive list of all pending Chapter 13
cases in which the Chapter 13 Plan provides for the escrow of postpetition

9

mortgage payments with Ms. Tirelli or her law firm, inclusive of cases filed in
White Plains, Poughkeepsie and Manhattan.

*Id.*  On July 16, 2021, the Court granted Ms. Tirelli an additional two weeks to amend the plans

as required by the Adjournment Order.  *See Memorandum Endorsed Letter from Ms. Tirelli*

[ECF No. 124].[5]

Consistent with the Adjournment Order, Ms. Tirelli provided on August 4, 2021 "a

comprehensive list of all pending Chapter 13 cases in which the Chapter 13 Plan provides for the

escrow of postpetition mortgage payments with Ms. Tirelli or her law firm," by listing one case:

*In re Desmond*, Case No. 18-23750 (SHL).  *See* Adjournment Order at 4; *Statement in*

*Compliance with Scheduling Order Dated July 2, 2021* [ECF No. 132].  On September 20, 2021,

Ms. Tirelli filed her declaration in response to the OSC, along with a memorandum of law, in

which she asked the Court to vacate the OSC because she asserted that, among other things, "no

misrepresentation was ever knowingly made to the Court by the undersigned or person under her

direction or control at any time."  *See* Attorney Declaration ¶ 1; *see also Memorandum of Law* at

3 of 7 [ECF No. 139] (the "Memorandum of Law").  Ms. Tirelli further declared that her practice

of escrowing her clients' funds in matters involving disputed mortgages was "put in place, with

---

[5]        In July 2021, the UST brought to the Court's attention that in one of the above-captioned cases, *In re Watson*, Case No. 18-22923, Ms. Tirelli had unilaterally transferred funds from her Account to the Chapter 13 Trustee.  *See Memorandum Endorsed Letter of the UST*, dated July 15, 2021 [ECF No. 119].  Both the UST and the Chapter 13 Trustee felt that the Chapter 13 Trustee lacked the authority to hold these funds at the time and asked for an order preserving the status quo with respect to the escrow funds being held by Ms. Tirelli until they could assess the information that Ms. Tirelli was required to submit under the OSC and the Adjournment Order.  *Id.* at 4.  On July 21, 2021, the Court held a hearing on the request and subsequently ordered that "in the [Debtors'] Cases and all other applicable chapter 13 cases in which [Ms. Tirelli] is debtor's counsel, [she] shall keep any escrow funds currently on deposit in her trust account(s) in such account(s), pending further order of the Court."  *See Order Imposing Status Quo re: Escrow Funds Pending Disposition of Order to Show Cause Why Court Should Not Sanction Counsel* at 4 (the "Status Quo Order") [ECF No. 160].  The Status Quo Order also permitted Ms. Tirelli, "on a case-by-case basis, [to] seek relief from this Order with respect to the status quo directed above, including on the ground that such relief is necessary to ensure compliance with the Connecticut Code of Conduct Rule 1.15(e)." *Id.* at 5.  The Status Quo Order further provided that it would survive the dismissal of any of the Debtors' cases and that the dismissal of any such case would not divest the Court of jurisdiction with respect to the OSC, the Adjournment Order, or the Status Quo Order.  *See id.*

the knowledge, consent and actual direction of Judge Robert Drain, and continued before Judge

Lane (until phased out in 2019). . . ." Attorney Declaration ¶¶ 2, 4.  Additionally, Ms. Tirelli

asserted that "[e]thical considerations precluded [her] from volunteering the fact that a particular

Debtor/Client had not made certain payments to [her]" because she "cannot act in a manner

contrary to the client's interest."  *Id*. ¶ 14.  In response to the OSC's direction that Ms. Tirelli set

forth "the extent that the funds actually held in escrow do not match the amount that should have

been in escrow based on representations made to the Court, an explanation as to why such a

circumstance does not constitute sanctionable conduct," *see* OSC at 6-7, Ms. Tirelli essentially

said that she could not answer that question:

> No representations were ever made to the Court except for true and accurate
> representations as to sums held, or that no funds were held.  Without knowing
> which 'representations made to the Court' are being referenced, the undersigned
> is unable to intelligently respond other than to make clear that at no time has the
> undersigned ever represented to the Court that funds were held by her office, if
> such representations were not entirely accurate in all respects.

Attorney Declaration ¶ 34; *see also* Memorandum of Law at 6 of 7 ("The order to show [cause]

lists seventeen cases in the caption.  Yet, there are no specific allegations in the order to show

cause or in the single footnote listing those 17 cases where Ms. Tirelli is alleged to have made 'a

false statement of material fact or law . . . .'").  Ms. Tirelli argued that she does not fund the

Debtors' plans and that the obligation is on the Debtors to fund their own plans and adhere to the

terms of those plans.  *See* Attorney Declaration ¶¶ 35-36; *see also* Memorandum of Law at 6 of 7

("[T]he failure of a debtor to comply with the provisions of a Chapter 13 plan does not translate

to the plan constituting a false statement . . ."); *id.* at 7 of 7 ("No basis exists to suggest that Ms.

Tirelli knew, or should have known, that at the time of the subject Chapter 13 Plan(s), the

relevant debtor would not honor the provision requiring remittance of post-petition payments.").

Based on Ms. Tirelli's Attorney Declaration and the attached exhibit—and as helpfully summarized by the UST—the 17 above-captioned cases consist of two broad groups: (1) three "set-aside cases," in which the Debtors were to set aside postpetition mortgage payments on their own rather than pay the mortgagees;[6] and (2) 13 "escrow cases," in which Ms. Tirelli was to hold the mortgage payments in an escrow account. *See* Attorney Declaration, Ex. A; UST Recommendation at 8.[7]  In six of the 13 escrow cases, the Debtors did not actually deliver any postpetition mortgage payments to Ms. Tirelli's IOLTA trust account (the "Account").[8] *See* Attorney Declaration, Ex. A.[9]  In four of the 13 escrow cases, Ms. Tirelli no longer held funds in escrow at the time that the OSC was issued because the funds had already been turned over to the mortgagees or the Chapter 13 Trustee. *Id.*[10]  As of September 20, 2021, Ms. Tirelli was holding escrow funds totaling $72,511 in four of the 17 above-captioned cases—specifically, in three escrow cases and one set-aside case. *Id.*[11]

---

[6]      The three set-aside cases are: 1) *Justo Reyes*, Case No. 16-22556; (2) *Karen Jackson*, Case No. 16-23514; and (3) *Janet Berger*, Case No. 17-22921. *See* Attorney Declaration, Ex. A [ECF No. 139-2]; UST Recommendation at 8 n.4.  The Chapter 13 plan filed in the *Berger* case did not contain an escrow provision, but the Debtor nonetheless delivered postpetition mortgage payments of $28,800 to Ms. Tirelli, who held the funds in escrow until January 2022. UST Recommendation at 8 n.4; *see* Attorney Declaration, Ex. A.

[7]      Additionally, one case was neither a set-aside case nor an escrow case: *Blossom J. Consingh*, Case No. 19-23034 (SHL).  *See* Attorney Declaration, Ex. A; UST Recommendation at 8 n.5.  In that case, there was no provision in the Chapter 13 plan indicating that payments would be placed in escrow and no payments were placed in escrow; rather the Debtor paid the mortgagee directly.  *See* Attorney Decl., Ex. A at 29 & n.10.

[8]      The Account is a trust account established by Ms. Tirelli at Chase with the last four digits of 8685.  *See* Exhibit A to the UST Recommendation at 36

[9]      These cases are: (1) *Frank Occhipinti*, Case No. 18-22690; (2) *Douglas Kramer*, Case No. 18-22940; (3) *Charmain Brown*, Case No. 18-23036; (4) *Janice Desmond*, Case No. 18-23750; (5) *Suzanne Faupel*, Case No. 19-22172; and (6) *Christopher Gizzo*, Case No. 19-22051.  *See* UST Recommendation at 9 n.6.

[10]      These cases are: (1) *John Kolkowski*, Case No. 19-22172; (2) *Catherine Pelle*, Case No. 19-22229; (3) *Sarah Frankel*, Case No. 19-22281; and (4) *Malka Farkas*, Case No. 19-22520.  *See* UST Recommendation at 9 n.7.

[11]      The three escrow cases are: (1) *Anastasia Cretekos*, Case No. 18-22239 (Ms. Tirelli was holding $28,000 in escrow); (2) *Richard Watson*, Case No. 18-22923 (Ms. Tirelli was holding $8,511 in escrow); and (3) *David Akerib*, Case No. 19-22276 (Ms. Tirelli was holding $7,200 in escrow).  *See* UST Recommendation at 9 n.8.  The set-aside case is (4) *Janet Berger*, Case No. 17-22921 (Ms. Tirelli was holding $28,800 in escrow).  *See id.*

C. **The October Hearing on the OSC and Related Court Directives**

At a hearing on the OSC on October 20, 2021, the Court began by noting that after reviewing a variety of the Chapter 13 cases in which the escrow issue had arisen, "the most common observation is that there would be a significant length of time when the issue was asked about and wasn't responded to." *See* Hr'g Tr. 8:23-25 (Oct. 20, 2021) [ECF No. 166]. Ms. Tirelli's counsel asserted that when the issue was raised in multiple instances in 2019 and 2020, "Ms. Tirelli or a member of her staff was transparent and overt with the Court and said that funds had not in fact been held in escrow as represented by the debtor in the plan." *Id*. at 11:6-12. But the Court responded that:

> [a]ctually, that's not my understanding of what happened. My understanding is that there were numerous inquiries, but the usual response, with an exception here or there, was that people would have to look into it. And so, I think that's why I mentioned in the first case is that there were numerous requests over time to look into it . . . [and the response was often] "we'll have to look into that" . . . [b]ut I don't think it became clear that there were instances where the money statement, "it was in the plan," and notwithstanding that statement, there was no money that had been held in escrow . . . until June of 2021.

*Id.* at 11:13-12:6.

As an example, the Court discussed the above-captioned case of *Karen Jackson*, Case No. 16-23514. In that case, there was a discussion at a hearing held in May 2019 about escrow payments and counsel's lack of information at that time, a subsequent discussion at a hearing in January 2021 where the Chapter 13 Trustee requested that Ms. Tirelli's associate look into whether money was being escrowed, yet another response at a hearing in March 2021 that counsel would inquire about the escrow and provide that information at the next hearing and finally an answer was given to the Court at a hearing in June of 2021. *Id.* at 9:1-6. The Court further noted that this was not a "unique circumstance" as there were also numerous inquiries in the above-captioned case of *Christopher Gizzo*, Case No. 19-22051. *Id.* at 9:7-9. Moreover,

representations were made in these cases—and as a further example, in *John Kolkowski*, Case

No. 19-22172 at a hearing in February 2020—that funds were "being held in escrow until we can

determine the actual creditor." *Id.* at 9:9-14.  The Court further explained that "this approach

was presented to the Court that whenever there were instances like that, certainly the

understanding that I had . . . was that those payments, if they were provided for to be made in

escrow that they were being made in escrow," which the Court noted was important because

there was nothing the Court, the Chapter 13 Trustee, or creditors could do to verify that that was

in fact occurring.  *Id*. at 9:14-22.

        The Court then expanded on its "frustration."  It explained that, since this arrangement

was in the Chapter 13 plans and since it "had been represented in one case or another that this

was the 'plan', when it turned out to not really be what was being done, and the fact that it

couldn't be checked on by anybody but debtor's counsel, I think that was a very stark revelation

and a concerning one."  *Id.* at 13: 17-23.  As a further example of its concerns, the Court raised

another incident that occurred earlier that day in a hearing held in the above-captioned case of

*Janice Desmond*, Case No. 18-23750.  *Id.* at 9:24-10:6.  In that hearing, the Debtor asserted that

when she told Ms. Tirelli that she did not have the money to put into escrow, Ms. Tirelli's

response was "don't worry about it, we'll talk about it again."  Hr'g Tr. 6:2-5 (Oct. 20, 2021)

[Case No. 18-23750, ECF No. 99].  The Debtor then added, "And I'll be honest with you, I never

thought about it again, and I never heard anything from Ms. Tirelli about it, that I still need to

start putting money in there."  *Id.* at 6:5-7.

        Based on this initial hearing on the merits of the OSC, the Court permanently banned the

practice of escrowing postpetition mortgage payments.  *See* Hr'g Tr. 14:25-15:5 (Oct. 20, 2021).

In addition, the Court issued four directives to Ms. Tirelli with respect to the OSC.  *See id.* at

40:1-7.  First, the Court requested confirmation in writing that the escrow practice in question

had ceased.  *See id.* at 33:24-34:14.  Second, the Court directed that Ms. Tirelli report whether

there were any other cases in which these escrow provisions were included in the Chapter 13

plans.  *See id.* at 35:19-36:7.  Third, the Court asked that Ms. Tirelli consult with the UST and

the Chapter 13 Trustee to provide a proposal as to what should happen to the funds being held in

escrow.  *See id*. at 44:14-46:19.  Fourth, the Court directed Ms. Tirelli to provide details about

the escrow accounts that were set up in connection with the above-captioned cases, including an

accounting.  *See id*. at 42:16-22.  As to this fourth directive, the Court specifically requested "the

date it was set up, what sort of account was set up, what that looked like, is it a sub-account, is it

a separate account, where is it kept, the kinds of details that you would expect [if] someone said,

from an accounting point of view, what's the deal with a particular escrow account."  *Id*.  The

Court further advised Ms. Tirelli to discuss with the UST and Ch. 13 Trustee the details that they

felt were necessary to provide.  *See id.* at 34:15-35:10.  As to the accounting, the UST discussed

its desire for primary source documents, as opposed to summaries, and the Court stressed the

importance of providing "statements and . . . financial records associated with that account that

speak for themselves and give an unvarnished accounting of what they are.  And so, I would

think that it would be as simple as getting the bank statements for the accounts."  *Id.* at 48:3-

50:6.

      Ms. Tirelli's counsel agreed to provide the information requested by the Court within 30

days, by November 13, 2021.  *See id.* at 43:2; 47:15.  The Court then so-ordered the record with

respect to its directives.  *See id.* at 50:11-25.

      Despite the Court's directive that Ms. Tirelli should consult the UST and the Chapter 13

Trustee about a proposal for the ultimate disposition of the escrow funds, Ms. Tirelli instead filed

four notices of presentment seeking the release of escrow funds in four of the above-captioned

cases. *See Anastasia Cretekos*, Case No. 18-22239, ECF No. 117; *Richard Watson*, Case No.

18-22923, ECF No. 128; *David Akerib*, Case No. 19-22276, ECF No. 99; *Janet Berger*, Case No.

17-22921, ECF No. 91.   The UST objected that these motions were filed unilaterality without

first consulting the UST or the Chapter 13 Trustee.  *See* UST Recommendation at 13-15.[12]

In mid-November 2021, Ms. Tirelli filed a *Supplemental Attorney Declaration* [ECF No.

159] declaring that neither she nor her firm were holding funds in escrow in any pending

bankruptcy cases, other than the four cases that were the subject of the prior notices of

presentment.  Supplemental Attorney Decl. ¶ 2.  Ms. Tirelli further stated in writing that she

"ended the practice of incorporating language in certain chapter 13 plans setting aside debtor

mortgage payments into escrow pending resolution of disputes in or about late 2019," and that

she was no longer offering escrow services for her bankruptcy clients.  *Id.* ¶¶ 3-4.  Ms. Tirelli

also attached escrow summaries for eight cases in which she had held funds either before or after

the OSC was issued, including the four cases where she still retained funds.  *See id.* at ¶ 5, 6 of

58 to 58 of 58.  Finally, Ms. Tirelli averred that all of the debtors in the above-captioned cases

had been provided with copies of their escrow summaries and that none had expressed any

dispute as to the records maintained by Ms. Tirelli's firm.  *Id.* ¶ 6.

In the UST's response to Ms. Tirelli's supplemental declaration, the UST asserted that "it

appears that Ms. Tirelli had provided a calculation of funds held in escrow in the Applicable

Cases, amended the applicable chapter 13 plans to delete the offending escrow provisions, [ ]

---

[12]      Following the Chapter 13 Trustee's objection to the release of funds, and a subsequent hearing on
December 15, 2021, as further discussed below, the funds in these four cases were ultimately ordered released in
January 2022.  *See Affirmation in Opposition* [Case No. 18-22239, ECF No. 118; Case No. 18-22923, ECF No. 130;
Case No. 19-22276, ECF No. 101; Case No. 17-22921, ECF No. 94]; Hr'g Tr. (Dec. 15, 2021) [Case No. 19-22007,
ECF No. 85]; *Order Approving and Directing Escrow Reimbursement* [Case No. 18-22239, ECF No. 125; Case No.
18-22923, ECF No. 140; Case No. 19-22276, ECF. No. 112; Case No. 17-22921, ECF No. 99].

averted that she had ceased the escrow practice[,]" and represented that she "held no escrow funds in cases other than the Affected Cases." *See UST's Response to Supplemental Attorney Declaration* at 14 [ECF No. 163]. But the UST asserted that three items remained open and outstanding: (1) a comparison of the amounts held in escrow vis-à-vis the amounts that should have been held in escrow; (2) the disposition of the escrow funds in accordance with the Court's order at the October 20, 2021 hearing; and (3) the filing of relevant escrow bank statements, rather than the summaries prepared by Ms. Tirelli. *See id.* at 14-15. The Chapter 13 Trustee similarly took issue with Ms. Tirelli's failure to provide primary source escrow information in compliance with the Court's directive at the October 20, 2021 hearing. *See Affirmation with Citation to Legal Authority in Relation to Debtor(s)' Counsel's Responses to Order to Show Cause* at 10-13 [ECF No. 162]. Additionally, the UST argued that Ms. Tirelli's assertions that certain unidentified "ethical considerations" precluded her from volunteering the fact that her clients failed to make escrow payments was mistaken as a matter of law because attorney-client privilege issues were not implicated by Ms. Tirelli's holding funds in escrow, which the UST contended involved Ms. Tirelli functioning in a non-legal, unprivileged capacity. *See UST's Response to Supplemental Attorney Declaration* at 15-16.

D. **The December 15, 2021 Hearing on the OSC**

At a continued hearing on the OSC held on December 15, 2021, the Court addressed the outstanding issues raised by the UST and the Chapter 13 Trustee. *See* Hr'g Tr. (Dec. 15, 2021) [Case No. 19-22007, ECF No. 85]. As to the first open item raised by the UST—a comparison of the amounts held in escrow vis-à-vis the amount that should have been held—Ms. Tirelli's counsel stated that "we have attempted to address this substantively but respectfully find that to be a relatively impossible task because it's nebulous as to how long these funds should have been

17

held in escrow" and concluded that "[n]umber one, it's impractical to give a number because that number is entirely unidentifiable; and number two, respectfully, to what end?" *Id.* at 8:22-9:11. The Court ultimately concluded that "I now have a number—an estimate from both the Chapter 13 Trustee and the [UST] of the amount of money that they believe is involved.  And if . . . Ms. Tirelli has a strong view and her counsel has a strong view that that number's incorrect, well, then they'll have to come forward with some other number and some other set of calculations.  If not, that's what I'm assuming is the number because those folks have done the math. . . ." *Id.* at 34:13-24.

As to the second item listed by the UST—the release of escrow funds—Ms. Tirelli's counsel stated that it was not his understanding that the Court had directed Ms. Tirelli to have discussions with the UST and the Chapter 13 Trustee related to the release of funds; rather, he understood the direction to be that the requests to release funds could be done by letter applications on notice. *See id.* at 10:2-16.  The Court disagreed with that characterization.  *See generally* Hr'g Tr. 44:14-46:19 (Oct. 20, 2021) (Court directing Ms. Tirelli to consult with the UST and Chapter 13 Trustee regarding release of escrow funds and submit plan regarding such funds).  In any event, the Court ultimately decided that

> it's appropriate at this time to release the funds to any debtors who have made a request.  I think that can be done with an order, and I think that the order can cover all the outstanding requests.  I think it's appropriate to either in that order or as an attachment to identify what money there is, who it's going to, and where it's coming from.  So that, again, we preserve some of the status quo with the understanding of the accounts.

Hr'g Tr. 29:17-25 (Dec. 15, 2021).

As to the third issue raised by the Trustees—the filing of primary source escrow documentation—the Court once again stated its view that these documents should be provided:

> [W]hy can't people just give copies of the whatever bank accounts existed,
> whatever account information there is?  A summary is a summary, meaning it's
> secondhand . . . statements of what people's understanding is.  And it's no
> substitute for the actual account information. . . .  I didn't think, frankly, it would
> be that difficult to get that kind of account information.  It's the kinds of things
> that people ask for in discovery in financial cases all the time.

*Id*. at 12:4-12.  In response, Ms. Tirelli's counsel cited New York Rule of Professional Conduct

1.15(i) and argued that this Court is not authorized to direct this kind of primary source account

information because it is not an Appellate Division of the New York state courts.  *See id*. at

12:14-13:5.  Additionally, Ms. Tirelli's counsel asserted that "the appropriate investigatory arm

to look into any escrow accounts would be a grievance committee" and that she needed to keep

her clients' information confidential to protect attorney-client privilege.  *Id.* at 13:11-14:7.  But

the Court was not persuaded.  It expressed doubt that information about the funds maintained in

these accounts was covered by attorney-client privilege; in any event, the Court suggested—and

the parties agreed—that Ms. Tirelli could deliver a representative sample of redacted bank

statements to the UST and the Chapter 13 Trustee and should negotiate a confidentiality order to

address any concerns that Ms. Tirelli might have regarding the privacy of information contained

in the records.  *Id.* at 14:8-11, 16:14-24:7, 26:13-24, 32:2-34:12.  The UST noted that it

contemplated making a request for a larger sample in the future.  *See id.* at 33:15-17 ("We'd

have to see a small sample before we can determine, I think, what a larger sample would be and

then the entire universe.").

**E.  The January 12, 2022 Hearing on the OSC**

At a hearing held on January 12, 2022, Ms. Tirelli's counsel represented that all escrow

funds had been released to all the applicable Debtors consistent with the direction of the Court.

Hr'g Tr. 10:4-13 (Jan. 12, 2022) [ECF No. 170].  The parties further informed the Court that Ms.

Tirelli's counsel had supplied both the UST and the Chapter 13 Trustee with a redacted sampling

of escrow bank statements as discussed at the previous conference and that they were in the

process of exchanging views on the samples and working through issues regarding the exchange

of information that might ultimately require the intervention of the Court.  *See id.* at 11:8-

19:15.[13]

In a subsequent letter to the Court shortly after this hearing, counsel to Ms. Tirelli

reported that she had provided supplemental sample statements with fewer redactions that were

satisfactory to both the UST and the Chapter 13 Trustee.  *See* Letter of Evan Wiederkehr, Esq.,

counsel to Ms. Tirelli, dated Feb. 11, 2022, at 2 of 33 [ECF No. 167].  The letter notes that a

request had been made for two years of escrow account statements, with Ms. Tirelli agreeing to

provide "the best evidence available to prove that the funds represented to have been held in

escrow were properly maintained and released to the intended recipient."  *See id.* at 2-3 of 33.

This "best evidence" appears to have been Ms. Tirelli's own summary listing those Debtors

whose plans did not include escrow language and those Debtors who did not remit any funds into

escrow.  *See id.* at 3 of 33.  As proof that the correct amounts were held in escrow for those

Debtors that did pay, information was provided consisting of copies of cancelled escrow account

checks made payable to secured creditors, the Chapter 13 Trustee, or, certain orders of this Court

referred to as "Consent Orders" supported by directives of unnamed Debtors and, in one case,

Dawn Kirby, Esq., who been hired as new counsel for one of the Debtors  *See id.*

The UST took issue with Ms. Tirelli's refusal to supply the additional two years of

escrow statements, arguing that the OSC remained unresolved without the delivery of a full set

of redacted escrow account statements because neither the Court, the UST, or the Chapter 13

---

[13]     Counsel to Ms. Tirelli stated that because there was no identifying information contained in the sampling
provided, the parties did not proceed with entering into a confidentiality order.  Hr'g Tr. 11:20-22 (Jan. 12, 2022).

Trustee could corroborate whether the funds of the affected Debtors remained in Ms. Tirelli's

Account before final disbursement. *See* Letter of Andrew D. Velez Rivera, dated February 14,

2022, at 2 of 2 [ECF No. 168].

On February 15, 2022, the Court held a further hearing to discuss the treatment of funds

in the Account. *See* Hr'g Tr. (Feb. 15, 2022) [ECF No. 171]. The Court began the hearing by

noting its agreement with the UST that the full scope of the issue covered by the OSC included

the treatment of the funds in the Account. *Id.* at 7:1-8:1. The Court noted that "this issue is

squarely within the scope of the order to show cause. It's really a fundamental question about

what happened, and what safeguards existed, and how the funds were treated. *Id.* at 6:12-14.

The Court also expressed its frustration at the "slow pace" of the OSC proceedings, in particular

with the continued failure to produce the underlying account records. It commented:

> We've . . . had five hearing[s] over the last six months, and there's been clear
> direction about this issue both at the October 20th hearing and the December 15th
> hearing. On October 20th, I explained that we needed bank statements to
> [explain] what happened, not summaries. December 15th, we went back again to
> what had been identified as the third bullet point in the [UST] submission at the
> time. I said, why can't we just get copies of whatever bank accounts existed, and
> whatever account information there is and that the summaries and secondhand
> statements are not a substitute for that . . . . I had talked about sampling, and said,
> hey, give a representative sample, so at least we see what we're talking about. . . .
> I'm done with half measures at this point . . . . I'm just going to order that every
> bank statement that is in Ms. Tirelli's possession for these escrow accounts be
> produced. . . .

*Id.* at 8:2-9:3. The Court noted that the information should be provided to the UST and the

Chapter 13 Trustee, and again suggested that a confidentiality order be submitted to address any

concerns regarding confidential information. *See id.* at 10:6-12:1.

In response, Ms. Tirelli's counsel argued that Ms. Tirelli had demonstrated beyond

dispute "the funds that were released from her escrow and the recipients of those funds, which

match the accounting records. And, respectfully, to the extent now the question is, how were

those funds maintained, I believe that exceeds the scope of the order to show cause, and [Ms.

Tirelli] should be entitled to notice of what the nature of the allegation is because it seems to me

that the order to show cause . . . has been expanded . . . and now, seeks to have her disprove

some sort of attorney malfeasance." *Id.* at 15:12-24.  The Court once again disagreed, noting

that the treatment of the funds identified in these plans as being escrowed was central to the

Court's inquiry.  It opined that the OSC:

> doesn't seek to have her prove or disprove anything.  I just want the bank records
> that deal with the escrow account.  The escrow accounts are the focus of the order
> to show cause.  Again, it's a term of art, what an escrow account is, and there are
> certain requirements for escrow accounts and safeguards, and I don't know how
> these funds were maintained when they were represented to me to be put in an
> escrow account.  I know that they were put into an account and the same amount
> of money was later given back to these folks.  Again, by framing it that way,
> you're narrowing the scope of the [OSC] . . . .

*Id*. at 15:25-16:10.  The Court overruled counsel's objection with respect to the scope of the

OSC.  *See id*. at 16:13-14.

Consistent with that ruling, the Court issued an order directing Ms. Tirelli to "submit all

the underlying records for the escrow account(s) at issue in the [OSC] to the Court for *in camera*

review and, at the same time, she shall produce such records for review to the [UST]'s Office . . .

and to the [ ] Chapter 13 Trustee . . . on a 'Highly Confidential/Attorneys' Eyes Only' basis."

*Order Directing Linda M. Tirelli, Esq., to Submit Bank Records to this Court for In Camera

Review* at 5 [ECF No. 169] (the "Production Order").  The Production Order also permitted Ms.

Tirelli to include an explanatory cover letter along with her production.  *See id.*  The escrow

records were to be submitted by no later than March 8, 2022.  *See id.*

### F.  Final Hearings on the OSC

Following Ms. Tirelli's *in camera* production of the unredacted escrow account

statements, the Court held another hearing on March 24, 2022.  *See* Hr'g Tr. (Mar. 24, 2022)

[ECF No. 175].  At the hearing, the UST raised a concern about a shortfall in Ms. Tirelli's Account lasting from June 17, 2021 through early August 2021 in the amount of $24,000.  *See id*. at 6:19-8:17.[14]  Ms. Tirelli's counsel acknowledged that there was indeed a shortfall that occurred due to a "bookkeeping error when there should have been two deposits for $21,300 to correlate with the two withdrawals" that totaled $42,600 for escrow account activity unrelated to the Debtors.  *See id.* at 20:22-22:16.  This shortfall apparently began in June 2019, according to Ms. Tirelli's counsel—two years earlier than the UST had suggested—and was remediated with a deposit in August 2021.  *See id.* at 20:22-21:12; *see also id.* at 21:24-22:6 (after the Court asked to clarify that the shortfall in the Account was over a two-year period, Ms. Tirelli's counsel answered, "Absolutely.  Yes.  The answer is yes.").[15]

After this clarification, Ms. Tirelli's counsel asked the Court to consider the OSC to have been fully addressed, a request the Court denied.  *See id.* at 25:11-25:20.  Ms. Tirelli's counsel responded that if escrow account mismanagement was at issue, then "the appropriate forum for that would be a referral to the grievance committee, who handles escrow account management.  And we wouldn't oppose that.  We believe that that would be the preferred forum to deal with escrow account management issues then in the context of this bankruptcy court."  *Id.* at 26:11-19.  Rather than terminate the OSC, the Court instead indicated its intent for the parties to brief their views on the merits of the OSC.  *Id.* at 10:13-11:4; *see also id.* at 23:19-24:8.

---

[14]    The UST also raised a concern about its inability to trace back to the source a purported credit for certain Debtors' escrow funds in the amount of $65,000 that were deposited in April 2019 from an interim account into a new IOLA escrow account established by Ms. Tirelli when she formed a new law firm.  *See* Hr'g Tr. 6:19-8:17, 14:6-15:1 (Mar. 24, 2022).  Ms. Tirelli's counsel explained that the funds could not be traced through the interim account because instead of transferring funds from the interim account, the $65,000 deposit into the new IOLA escrow account actually came from a fee paid to Ms. Tirelli from an outside party that she later deposited into her escrow account and credited to the Debtors' escrow balances.  *See id.* at 16:2-19:15.

[15]    The Court took the comments made by Ms. Tirelli's counsel at the March 24th hearing "as representation to the Court as to certain material facts relevant to this [OSC], and that they've been offered in lieu of providing additional documents," to which Ms. Tirelli's counsel agreed.  *See id.* at 24:11-24.

Counsel to Ms. Tirelli made an oral application to have the subsequent pleadings addressing the merits of the OSC filed under seal. *See id.* at 27:14-19. The Court noted its reticence to seal the pleadings and the UST expressed its desire to have its pleadings filed on the public docket, arguing that there was no reason to seal the information. *See id.* at 27:20-28:12, 28:22-29:4. Counsel to Ms. Tirelli countered that disciplinary proceedings were under seal and that these proceedings should be handled similarly. *Id.* at 28:14-21. In response, the Court directed Ms. Tirelli to file a sealing motion. *See id.* at 29:1-30:10. To preserve confidentiality pending resolution of any sealing motion filed by Ms. Tirelli, the Court directed the UST and the Chapter 13 Trustee to file their pleadings under seal in the first instance, with Ms. Tirelli's sealing motion to follow detailing the specific information she contended should be sealed. *See* Hr'g Tr. 5:11-25 (May 3, 2022) [ECF No. 178].[16]

On June 15, 2022, the UST filed a Motion to Unseal in fully redacted format [ECF No. 182]. On June 14, 2022, the Chapter 13 Trustee filed the Chapter 13 Trustee's Recommendations in fully redacted format [ECF No. 180] and an *Affirmation of Joinder to the Motion to Unseal*, which joinder was also filed in fully redacted format [ECF No. 181]. Ms. Tirelli emailed several documents directly to the Court, including an *Opposition to Trustees' Motion to Unseal Recommendation*, dated August 1, 2022 (the "Tirelli Unsealing Opposition"), an *Affirmation of Counsel to Linda Tirelli with Citation to Legal Authority in Opposition to Recommendations of Chapter 13 Trustee and United States Trustee*, dated August 1, 2022 (the

---

[16]    Things did not work as planned. On May 26, 2022, the UST filed the UST Recommendation in fully redacted format [ECF No. 176] and the Motion to Unseal in unredacted format [ECF No. 177]. The Court then entered an *Order Scheduling Hearing on Sealing Motion* [ECF No. 179]. To preserve the rights of Ms. Tirelli pending resolution of her sealing motion, the Order directed the Clerk of the Court to temporarily block public access to the Motion to Unseal until a final determination was made on the sealing issue. *See id.* at 4.

"Tirelli Opposition").  Neither of these documents were filed on the docket, either in redacted or sealed format.[17]

A hearing was held on the merits of the OSC and the Motion to Unseal on September 14, 2022.[18]

In its papers and at oral argument on the merits of the OSC, the UST has requested that the Court refer Ms. Tirelli's conduct to the Committee on Grievances of the United States District Court for the Southern District of New York and to the Connecticut State Bar, where she is licensed to practice; the UST also has requested that the Court impose sanctions against Ms. Tirelli in a manner that the Court deems appropriate.  *See* UST Recommendation at 2. Specifically, the UST Recommendation argues that Ms. Tirelli's Account fell below the amount she was required to maintain for four of the Debtors, that she comingled funds in the Account with other funds, and that she likely failed to conduct reconciliations of the Account, all in violation of the professional conduct rules governing IOLTA accounts in both Connecticut and New York.  *See id.* at 1.  The UST Recommendation also asserts that the shortfall resulted in a misrepresentation to the Court, since the Debtors' plans of reorganization stated that Ms. Tirelli would be holding the Debtors' mortgage payments in escrow and over the period that there was a shortfall, Ms. Tirelli by definition did not hold the funds.  *See id.* at 2.  The Chapter 13 Trustee

---

[17]    At the Court's direction, Ms. Tirelli subsequently filed the Tirelli Unsealing Opposition and the Tirelli Opposition under seal with the Office of the Clerk of the Court.  *See* Hr'g Tr. 73:17-74:5 (Sept. 14, 2022); *Response (Pending Seal)* [ECF No. 186].  The Office of the Clerk of the Court reports that the Tirelli Supplemental Opposition (as defined below) has not been filed.

[18]    On September 13, 2022, Ms. Tirelli emailed a *Supplemental Affirmation of Counsel to Linda Tirelli with Citation to Legal Authority in Opposition to Recommendations of Chapter 13 Trustee and United States Trustee* (the "Tirelli Supplemental Opposition").  This document also was not filed with the Court.  Due to the fact that the Ms. Tirelli's Supplemental Opposition had been filed on the eve of the hearing without prior notice to the Court, the UST or the Chapter 13 Trustee, the Court struck the pleading, but allowed for admission into the record of the transcripts of prior hearings in the Debtors' cases that were attached as exhibits to the Supplemental Opposition.  *See* Hr'g Tr. 47:18-48:7 (Sept. 14, 2022).

has joined in these recommendations and further has asserted that Ms. Tirelli's practices for the

escrowing of mortgage funds in the Debtors' cases constituted a form of implied and express

misrepresentation and suggests that it would be within the authority of the Court to fashion

sanctions that would be appropriate.  *See* Chapter 13 Trustee Recommendation at 7-10.  Ms.

Tirelli disagrees with the UST and the Chapter 13 Trustee, contending that she has already fully

addressed the issues raised in the OSC, that there was never an instance in which she made a

false statement to this Court and that any ethical issues are not properly before this Court and

should be addressed by the bar grievance committees in the jurisdictions in which Ms. Tirelli is

admitted.  *See* Tirelli Opposition at ¶¶ 16-17, 66.

## DISCUSSION

### A.  The Request to Seal

Before turning to the merits of the OSC, the Court must first determine whether any of

the information that Ms. Tirelli contends should be sealed in the OSC proceeding is entitled to

such treatment.  The Court concludes that none of this information should be sealed.[19]

---

[19]      Ms. Tirelli is not entirely clear about what information she thinks should be sealed.  At one point, the
Tirelli Unsealing Opposition seems to suggest that the entire record of the OSC should be sealed in all of the
Debtors' cases.  *See* Tirelli Unsealing Opposition at 11 ("In the instant matter, there has been no judicial
determination and therefore the filings should remain confidential.").  In another location, the Tirelli Unsealing
Opposition seems to suggest sealing of just the papers in the thirteen cases that don't reflect an escrow shortfall or to
seal only the pleadings relating to the sealing issue and the recommendations.  *See id.* at 3, 6 ("[C]ompeting
considerations outweigh the presumption of access, warranting the sealing of further submissions in this matter . . .
.[F]urther submissions in these proceedings should be sealed to protect Ms. Tirelli against the prejudicial and
potentially defamatory matters contained in papers filed in the above-captioned public docket(s)."); *see id.* at 4 ("It
is not subject to legitimate dispute that thirteen of the foregoing cases have no nexus to the issues raised.  For this
reason alone, these proceedings should be sealed. . . ."); *see also id.* at 11 ("Sealing further submissions, limited to
'suggestions' from counsel, is narrowly tailored.").

        When a question was raised regarding this issue at oral, counsel to Ms. Tirelli stated that "I think that what
we've asked to seal is the recommendations of the Trustee's Offices which are subjective characterizations and
argument which call into question whether or not Ms. Tirelli has lied to this Court."  *See* Hr'g Tr. 27:20-24 (Sept.
14, 2022).  Given this statement, the Court construes Ms. Tirelli's sealing request to cover only those sections of the
UST Recommendation and the Chapter 13 Trustee's Recommendations that contain argument relating to whether
Ms. Tirelli has made a misrepresentation to this Court.

1.  <u>The Applicable Legal Standard</u>

Courts recognize "a strong presumption and public policy in favor of public access to court records." *In re Food Mgmt. Grp.*, LLC, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007) (collecting cases); *see also Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.") (internal citations omitted). "This preference for public access is rooted in the public's first amendment right to know about the administration of justice. It helps safeguard 'the integrity, quality, and respect in our judicial system. . . .'" *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 26 (2d Cir. 1994) (quoting *In re Analytical Sys.*, 83 B.R. 833, 835 (Bankr. N.D. Ga. 1987)). The presumption is especially important in bankruptcy cases, where public access "fosters confidence among creditors regarding the fairness of the bankruptcy system." *In re Food Mgmt.*, 359 B.R. at 553.

Congress's "strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings" is codified in Section 107 of the Bankruptcy Code. *In re Orion*, 21 F.3d at 26. Section 107(a) states that, "except as provided in subsections (b) and (c) . . . , a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge." 11 U.S.C. § 107(a). Thus, "[t]he plain meaning of [Section] 107(a) mandates that *all* papers filed with the bankruptcy court are 'public records' unless the bankruptcy court 'decides to protect the information pursuant to the standards set forth in [S]ection 107(b).'" *In re Food Mgmt.*, 359 B.R. at 553 (emphasis in original) (quoting *In re Ionosphere Clubs*, 156 B.R. 414, 433 n.7 (S.D.N.Y. 1993)). Additionally, "[r]edacting portions of a document containing protectable information is

preferable to wholesale sealing . . . because the policy favoring public access supports making

public as much information as possible while still preserving confidentiality of protectable

information." *Motors Liquidation Co. Avoidance Action Trust v. JP Morgan Chase Bank, N.A.*

*(In re Motors Liquidation Co.)*, 561 B.R. 36, 42 (Bankr. S.D.N.Y. 2016).

  The narrowly tailored exceptions to this broad public access are set forth in Section

107(b) of the Bankruptcy Code. *See In re Borders Grp., Inc.*, 462 B.R. 42, 47 (Bankr. S.D.N.Y.

2011). Specifically, Section 107(b) provides that

> [o]n request of a party in interest, the bankruptcy court shall, and on the
> bankruptcy court's own motion, the bankruptcy court may-
>
> (1) protect an entity with respect to a trade secret or confidential research,
>  development, or commercial information; or
>
> (2) protect a person with respect to scandalous or defamatory matter contained in
> a paper filed in a case under this title.

11 U.S.C. 107(b). The party seeking to seal a document has the burden to prove that grounds

exist to grant the requested relief. *See In re Food Mgmt.*, 359 B.R. at 561. "Since the sealing of

records runs contrary to the strong policy of public access, only clear evidence of impropriety

can overcome the presumption and justify protection under § 107(b)(2)." *Togut v. Deutsche

Bank AG (In re Anthracite Capital, Inc.)*, 492 B.R. 162, 174 (Bankr. S.D.N.Y. 2013) (internal

citations and quotations omitted). "In order to meet this burden, the moving party must show

extraordinary circumstances and a compelling need for protection." *Id.* (quoting *In re Orion

Pictures Corp.*, 21 F.3d at 27). The Court must therefore "carefully and skeptically review

sealing requests to insure that there really is an extraordinary circumstance or compelling

need." *In re Orion*, 21 F.3d at 27. "If the Court finds that one of the exceptions outlined in

[Section] 107 apply, it must seal the documents." *In re Anthracite*, 492 B.R. at 174.

Section 107(b)(2) protects an individual from the filing of "scandalous" or "defamatory" material, which "has been defined as material that would cause a reasonable person to alter their opinion of a party based on the statements therein, taking those statements in the context in which they appear." *In re Food Mgmt.*, 359 B.R. at 557. In this jurisdiction, a party seeking redaction pursuant to Section 107(b)(2) must establish that the material is either "'(i) 'scandalous' because it was grossly offensive, irrelevant to the proceeding, and submitted for an improper use; or (ii) 'defamatory' because the statements 'can be clearly shown to be untrue without the need for discovery or a mini-trial.'" *In re Anthracite*, 492 B.R. 162, 174-75 (Bankr. S.D.N.Y. 2013) (quoting *Sec. Investor Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 2011 WL 1378602, at *3 (Bankr. S.D.N.Y. 2011)); *see also In re Food Mgmt.*, 359 B.R. at 557-60. "Inherent in the language of [Section] 107(b) is the requirement that the party requesting the extraordinary relief provide the court with specific factual and legal authority demonstrating that a particular document at issue is properly classified as 'confidential' or 'scandalous.'" *In re Anthracite*, 492 B.R. at 171 (citing *United States v. Continental Airlines, Inc. (In re Continental Airlines, Inc.)*, 150 B.R. 334, 340-41 (D. Del. 1993) (refusing to seal documents based on 'nothing more than the mere possibility' that they contained defamatory information)); *see also In re Food Mgmt.*, 359 B.R. at 561 ("To meet this burden of proof, [the proponent] must demonstrate extraordinary circumstances and compelling need to obtain protection.") (citing *Orion Pictures Corp.*, 21 F.3d at 27).

Ms. Tirelli asserts that the proceedings in these cases should be sealed to protect her "against the prejudicial and potentially defamatory matters contained in papers filed . . . and the undue risk to her professional reputation prior to final determination by the Court." Tirelli Unsealing Opposition at 6. Using the standard discussed above, the Court examines whether Ms.

Tirelli has met her burden to show that the pleadings in this case rise to the level of scandalous or defamatory material under Section 107(b)(2) of the Bankruptcy Code.

    2.  <u>Scandalous Material Under Section 107(b)(2)</u>

       When determining what constitutes scandalous material, a court must examine whether the material is grossly offensive, is relevant to the proceedings and is being used for an improper purpose. *See In re Food Mgmt.*, 359 B.R. at 557-59. With respect to whether materials are relevant to the proceedings, guidance is found in Fed. R. Civ. P. 12(f), which provides for striking materials from a pleading that are "redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); *see In re Food Mgmt.* 359 B.R. at 558-59. A court will be reluctant to strike material as scandalous under Rule 12(f), "unless the movant can show that no evidence in support of the allegation would be admissible." *Id.* at 558 (internal citations and quotations omitted). "[C]ourts will not strike scandalous statements that offend the sensibilities of the objecting party if the challenged allegations describe acts or events relevant to the action." *Id.* (internal citations and quotations omitted). Additionally, with respect to determining whether material is scandalous, courts will deny access to judicial documents "where open inspection may be used as a vehicle for improper purposes." *Id.* (quoting *Orion Pictures*, 21 F.3d at 27). "Because litigants frequently assign bad motives to allegations made by their adversaries, the improper purpose test needs to be applied carefully, hewing closely to the traditional standards for protecting against scandalous matter." *Id.*

       The Court finds that Ms. Tirelli has not established that the information here is scandalous under Section 107(b)(2) of the Bankruptcy Code. First, the material contained in the pleadings is a straightforward recitation of the facts underlying the actions taken by Ms. Tirelli with respect to the escrowing of funds in the Debtors' cases, as well as legal argument on the

implications of those actions.[20]  Having reviewed the material, the Court finds none of it to be grossly offensive.  *See, e.g., In re Fibermark, Inc.*, 330 B.R. 480, 507 (Bankr. D. Vt. 2005) ("The Seal Proponents allege that the Examiner's language is inflammatory, defamatory, and intemperate.  We must distinguish between critical and defamatory.").

Second, all the material contained in the pleadings is clearly relevant because it is central to resolving the issues raised by the Court in the OSC, including whether misrepresentations occurred in connection with the escrowing of funds in the Debtors' Chapter 13 cases and how such funds were actually treated.  That inquiry necessarily covers how best to remedy any problems.  Indeed, the Court referred this OSC matter to the UST "to provide its views on this matter based on any review it has conducted of the Debtors' cases and its consultation with relevant parties such as the Chapter 13 Trustee and Ms. Tirelli . . . ."  OSC at 6.  The Court did so specifically to rely on the expertise and neutrality of the UST under these circumstances and the information provided is necessary for the Court's adjudication of this matter.  *Cf. In re Fibermark*, 330 B.R. at 507 ("The Court and parties relied upon the experience and expertise of the Examiner to be the basis of a thorough and astute investigation and a cogent and sound report.  Since he investigated alleged breaches of fiduciary duty by well respected professionals, it was clear that the Report might be negative and strongly worded. It was within the Examiner's prerogative to present his observations, opinions and conclusions candidly and descriptively.").

Third, the material contained in the pleadings of the UST and the Chapter 13 Trustee was not filed for an improper purpose.  "[T]he U.S. trustees are responsible for protecting the public interest and ensuring that bankruptcy cases are conducted according to law."  *Adams v. Zarnel*

---

[20]    Indeed, Ms. Tirelli stated that she "takes no position with much of the procedural chronology" set forth in the UST Recommendations.  Tirelli Opposition ¶ 47.

*(In re Zarnel)*, 619 F.3d 156, 162 (2d Cir. 2010) (internal citations and quotations omitted); *see also In re United Artists Theatre Co.*, 315 F.3d 217, 225 (3d Cir. 2003) ("U.S. Trustees are officers of the Department of Justice who protect the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings."); 28 U.S.C. §§581-589.  Its role also includes protection of the integrity of the bankruptcy process, which is clearly implicated by the OSC's inquiry to examine whether misrepresentations have been made to this Court regarding the practices in these Chapter 13 cases.  As the Court sought the assistance of the UST as to the OSC, it is clear that the pleadings of the UST were in furtherance of its mission to protect the public interest and were clearly not filed for an improper purpose.

The Court reaches the same conclusion as to any pleadings filed by the Chapter 13 Trustee.  Like the UST, the Chapter 13 Trustee is appointed to serve the interest of all creditors in the Debtors' cases and clearly has an interest in the matters relating to the OSC.  *See Overbaugh v. Household Bank N.A. (In re Overbaugh)*, 559 F.3d 125, 129-30 (2d Cir. 2009) ("[T]he primary purpose of the Chapter 13 trustee is not just to serve the interests of the unsecured creditors, but rather, to serve the interests of all creditors.") (internal citations and quotations omitted).  "When a debtor files for bankruptcy under [C]hapter 13 of the Bankruptcy Code, the United States Trustee appoints a standing chapter 13 trustee to oversee the case.  A standing trustee is considered an independent party, representing neither the debtor nor the government. . . . As such, it is a chapter 13 trustee's duty to represent the estate." *Modikhan v. Aronow (In re Modikhan)*, 639 B.R. 792, 816 (Bankr. E.D.N.Y. 2022) (internal citations and quotations omitted).  "[I]nherent in the Chapter XIII trustee's fiduciary obligations is the duty to oversee the debtor's compliance with the plan, including the duty to take appropriate action when the debtor does not make the required payments." *In re Gorski*, 766 F.2d 723, 726 (2d Cir.

1985).  Moreover, the duties of a Chapter 13 Trustee are specified in Section 1302 of the

Bankruptcy Code "and include inform[ing] the debtor of his duties, discourage[ing] [sic]

fraudulent concealment of assets, and mak[ing] the debtor aware that there is someone other than

the bankruptcy court protecting the interests of the creditors."  *In re Modikhan*, 639 B.R. at 816-

17 (internal citations and quotations omitted).  These responsibilities are clearly implicated by

the OSC, which seeks to determine the appropriateness of the practices taken by Ms. Tirelli in

these Chapter 13 cases.  Thus, like the UST, the pleadings of the Chapter 13 Trustee were clearly

not filed for an improper purpose.

In sum, Ms. Tirelli has clearly not established any of the prongs necessary to seal the

information in the pleadings as scandalous materials under Section 107(b)(2) of the Bankruptcy

Code.

### 3.  Defamatory Material Under Section 107(b)(2)

Similarly, Ms. Tirelli has not met her burden to show the information contained in the

pleadings is defamatory.  The defamatory matter prong of Section 107(b)(2) "protects only

against untrue statements."  *See In re Food Mgmt.*, 359 B.R. at 560.  Such protection only

applies to statements "that can be clearly shown to be untrue without the need for discovery or a

mini-trial."  *Id.* at 556.  Even a potentially untrue statement is not considered defamatory under

Section 107(b)(2).  *See id.* at 560-61.  The vast majority of the information contained in the

pleadings is a factual recitation of what has taken place in the Debtors' cases up to this point.

Having reviewed the information, the Court finds it to be extremely accurate in its portrayal of

events.  The remaining information in the pleadings is legal argument as to whether those facts

rise to the level of sanctionable conduct, a question that was specifically raised by this Court's

OSC.  The Court finds nothing contained in those legal arguments to be clearly untrue.

At the penultimate hearing on the OSC, counsel to Ms. Tirelli argued that the pleadings filed by the UST and Chapter 13 Trustee are defamatory simply because they contain legal arguments that Ms. Tirelli has made a misrepresentation to the Court.[21]  *See* Hr'g Tr. 30:3-6 (Sept. 14, 2022) ("We assert the position that the recommendations on their face are defamatory by reason of attacking Ms. Tirelli as having made material misrepresentations to the Court.").[22]

---

[21]    *See also* Hr'g Tr. 25:6-8, 25:17-19 (Sept. 14, 2022) ("[T]here is no specific mandate or directive which is claimed to have been violated by Ms. Tirelli. . . . Ms. Tirelli never once made a record presentation that is deemed or even accused of being false or inaccurate."); *see id.* at 30:14-18 ("The United States Trustee and the Chapter 13 Trustee have now articulated a position that Ms. Tirelli has asserted material misstatements of fact to the Court without any semblance of evidence, no directive to review the record in a certain instance.").

At oral argument, counsel to Ms. Tirelli even suggested that any time an attorney in good standing was accused of making a misrepresentation to the Court, such allegation constituted per se defamation.  *See* Hr'g Tr. 26:18-24 (Sept. 14, 2022) ("I do believe that when an attorney is accused of making material misrepresentations to a Court which, in sum and substance, is lying to a Court, that it is defamatory to take a licensed attorney in good standing and to accuse them of lying.  I believe that the base definition of defamation per se as it relates to a lawyer is accusing an attorney of being a liar, especially before a tribunal.").  By this definition, the OSC itself could be considered defamatory.  *See* Tirelli Unsealing Opposition at 4 ("[T]he evidence before the Court confirms that the Order to Show Cause is unduly expansive, levels prejudicial, but unspecified, claims against Ms. Tirelli and will continue to unnecessarily mar her professional reputation and standard for years to come without any basis in actual fact or supporting documentation."); Hr'g Tr. 22:16-18, 23:2-4 (Sept. 14, 2022) (Ms. Tirelli counsel stating that "[t]here's a 17 case order to show cause which suggests that Ms. Tirelli made misrepresentations to the Court in some, if not all of those matters, on its face. . . And I believe, Your Honor, that it is, in fact, an issue of defamation when a lawyer's reputation is subject to this. . . ."); *see id.* 30:7-9 (Court asking "Doesn't the order to show cause do that then if you have that broad a definition?  It raises questions.").  Consistent with its conclusions above, the Court emphatically rejects Ms. Tirelli's arguments on this point.

[22]    Ms. Tirelli also cites Exhibit 1 to the Chapter 13 Trustee Recommendations as being defamatory.  *See* Tirelli Unsealing Opposition at 7.  That exhibit is a calculation by the Chapter 13 Trustee of the total amount of funds that should have been held in escrow by Ms. Tirelli in the cases.  *See* Chapter 13 Trustee Recommendations at 8 (describing Exhibit 1 as "a chart created by the Trustee's office that sets forth—based on the filed plans and the duration of time that the plans were in force before amendments or other dispositive events—the amounts that should have been held by Counsel" and noting that the chart "makes clear [that] Counsel's escrow practice was district wide and not isolated to the cases captioned" in the OSC and further noting that no comparable submission was submitted by Ms. Tirelli as required by the OSC); *see also id.* at Exhibit 1 (listing case numbers, debtor last names, petition dates, confirmation dates, postpetition mortgage set asides or escrow set asides, set aside or escrow calculations, total amounts set aside and status of case (whether pending, confirmed or dismissed)).

Ms. Tirelli labels the chart as defamatory because she claims it is untrue.  *See* Tirelli Unsealing Opposition ¶ 10 ("The chart created by the Chapter 13 Trustee and presented as evidence, 'Exhibit 1' to her submission, is so detached from the issues before this Court that for the purposes of the Order to Show Cause, they are untrue.  Even ignoring the dozens of entries by the Chapter 13 Trustee that have no bearing on any issues before this Court, and no basis in any fact, no relevant or material purpose supports their submission.  In the context of this proceeding, they are untrue and unduly prejudicial.").  But Ms. Tirelli has not come even remotely close to establishing the falsity of the information contained in the chart, thus failing to meet her burden under Section 107(b).  *In re Food Mgmt.*, 359 B.R. at 560. (defamatory material is only material "that can be clearly shown to be untrue without the need for discovery or a mini-trial" and a potentially untrue statement is not defamatory under Section 107(b)(2)).  Indeed, the OSC required Ms. Tirelli to file her own version of this document, but that was never done.  *See* OSC at 6-7; Hr'g Tr. 8:24-9:11 (Dec. 15, 2021) (explaining why Ms. Tirelli never provided such a document).

But Ms. Tirelli has fundamentally misunderstood the inquiry before the Court.  In fact, the

parties here agree—after an extensive period of fact finding—what happened in these cases.  The

vast majority of information contained in the pleadings that Ms. Tirelli seeks to have sealed was

derived from prior pleadings and hearing transcripts that are already on the public record of the

Debtors' cases.  In such circumstances, courts have held that they "lack[ed] the authority to seal

information derived from public documents." *In re Food Mgmt.*, 359 B.R. at 565 (citing *In re*

*Continental Airlines*, 150 B.R. at 339; *In re Overmyer*, 24 B.R. 437, 442 (Bankr. S.D.N.Y.

1982)).  Information that is already "part of the public record . . can hardly be characterized as

confidential, scandalous or defamatory matters." *In re Overmyer*, 24 B.R. at 442.  What is left is

each party's legal interpretation of these facts.  As such, the views of the UST and the Chapter 13

Trustee do not constitute statements "that can be clearly shown to be untrue without the need for

discovery or a mini-trial." *In re Food Mgmt.*, 359 B.R. at 556.  Rather, what exists in these

circumstances is a difference in legal interpretation. *See, e.g., In re Fibermark*, 330 B.R. at 507-

08 ("The Seal Proponents' allegations that the Report goes too far or that the

Examiner's conclusions are not supported by the facts go to the merits of the Report.  Such

allegations are not relevant to this inquiry under § 107.").  Indeed, to hold otherwise would

hamstring the ability of parties to make nuanced legal argument before the Court without being

accused of defamation.  Nothing contained in the pleadings has been shown to be clearly untrue

and the Court finds that the pleadings do not fall within the protections of Section 107(b)(2) as

containing defamatory matter.[23]

---

[23]    And as the Court concludes that Ms. Tirelli lacked candor in her statements to the Court in connection with
the escrowing of these funds, the Court agrees with the conclusions of the UST and the Chapter 13 Trustee that are
set forth in these pleadings. *See infra* Section B.2.

4. <u>Ms. Tirelli's Other Arguments</u>

Ms. Tirelli argues that the request to seal all further submissions relating to the issues raised in the OSC is necessary because a "lawyer's reputation is one of [her] most important professional assets." Tirelli Unsealing Opp. at 6-7 (quoting *Precision Specialty Metals, Inc. v. U.S.*, 315 F.3d 1346, 1353 (D.C. Cir. 2003)). The Court agrees with the importance of an attorney's reputation, but that alone is not enough to justify the sealing of the record in the Debtors' cases. The countervailing policy consideration at issue—public access to proceedings—is explicitly safeguarded by the Bankruptcy Code. Indeed, none of the cases that Ms. Tirelli cites regarding the importance of an attorney's reputation deal with sealing pleadings or the public's access to court records. *See generally Precision Specialty Metals*, 315 F.3d 1346 (allowing appellate review of formal reprimand for attorney misconduct and upholding reprimand under Fed. R. Civ. P. 11); *Butler v. Biocore Med. Techs., Inc.,* 348 F.3d 1163, 1168 (10th Cir. 2003) (holding that order finding attorney misconduct—but not imposing other sanction— is appealable, even if not labeled as a reprimand); *Williams v. U.S. (In re Williams)*, 156 F.3d 86, 89-90 (1st Cir. 1998) (holding that judicial findings of fact regarding attorney misconduct—including criticism of the attorneys—was not independently subject to appeal where corresponding monetary sanctions had been ameliorated); *Walter v. City of Mesquite*, 129 F.3d 831, 832-33 (5th Cir. 1997) (holding that monetary sanctions are unnecessary for appellate review of judicial reprimand of attorney and reversing finding of professional misconduct).

The decision in *In re Food Mgmt., Group, LLC*, 359 B.R. 543, is particularly instructive in denying Ms. Tirelli's request. In that bankruptcy proceeding, a Chapter 11 trustee sought to file an adversary complaint against numerous putative defendants, including a law firm and several of its partners in connection with their representation of the debtor during the bankruptcy

proceeding. *See id.* at 548-52. The complaint asserted, among other things, that the attorneys had violated Bankruptcy Rule 9014 by failing to disclose their prior representation of a party that was adverse to the debtor and had also violated their fiduciary duty to the debtor's estate by failing to disclose information to the court. *See id.* at 551-52. The firm and its partners filed a motion to have the complaint sealed under Section 107(b)(2) of the Bankruptcy Code for containing "scandalous or defamatory matter," arguing that the allegations in the complaint were untrue and that the mere placement of the allegations on the court's public docket would irreparably damage their professional reputation. *See id.* at 547, 561. The request to seal the complaint was opposed by both the Chapter 11 trustee and the UST. *See id.* at 547.

The court in *Food Mgmt.* denied the sealing request. It recognized that the allegations in the complaint could cause the attorneys and their firm to "suffer prejudice, negative publicity or possible financial adversity as a result of the public filing of th[e] complaint," but reasoned that "mere embarrassment or harm caused to the party is insufficient to grant protection under [Section] 107(b)(2)." *Id.* at 561 (citing *In re Analytical Sys., Inc.*, 83 B.R. 833 (Bankr. N.D. Ga. 1987)). The court noted that "[s]imply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records." *Id.* (quoting *In re Analytical Sys.*, 83 B.R. at 836).[24]

---

[24]    *See also Neal v. Kan. City Star (In re Neal)*, 461 F.3d 1048, 1054 (8th Cir. 2006) ("In cases analyzing [Section] 107(b)(2), courts have repeatedly stated that injury or potential injury to reputation is not enough to deny public access to court documents.") (internal citations omitted); *In re Anthracite*, 492 B.R. at 177 ("An unintended, potential secondary consequence of negative publicity does not warrant sealing[]. Nor is the fact that a filing is embarrassing to a party-in-interest a sufficient basis to justify sealing court records in the face of the express and important policy of public access to court records.") (internal citations and quotations omitted); *In re MUMA Servs.*, 279 B.R. 478, 484 (Bankr. D. Del. 2002) (Section 107(b) "was not intended to save the debtor or its creditors from embarrassment, or to protect their privacy in light of countervailing statutory, constitutional and policy concerns.") (internal citations omitted); *Hope on Behalf of Clark v. Pearson*, 38 B.R. 423, 424 (Bankr. M.D. Ga. 1984) ("It is not enough that the matter offends the sensibilities of the objecting party if the challenged allegations describe acts or events that are relevant to the action."); 2 Collier on Bankruptcy ¶ 107.03 (16th ed. 2023) ("Mere embarrassment, or harm to reputation based on nonscandalous, nondefamatory information disclosed is not sufficient cause to restrict public access. Section 107(b)(2), by its terms, applies only to scandalous or defamatory

37

During oral argument, counsel to Ms. Tirelli suggested that the Court should take an outcome determinative approach to sealing in such a case, proposing that the appropriate procedures would be for pleadings to initially be filed under seal and remain sealed until the Court determined whether any malfeasance had occurred. *See* Hr'g Tr. 30:19-33:21 (Sept. 14, 2022). If the Court determined that malfeasance in fact took place, the argument goes, then the record would be unsealed; if the determination was that there was no malfeasance, the record would remain sealed to protect the attorney from any reputational harm. *See id.*[25] But this cannot and should not be the standard in a public court of law, where an attorney's professional conduct raises "important issues bearing on the integrity and transparency of bankruptcy court proceedings, and the role that professionals play in insuring that the integrity of the proceedings is maintained." *In re Food. Mgmt.*, 359 B.R. at 547. Indeed, the bankruptcy bar in this jurisdiction should be made aware of what is expected of them in terms of their ethical conduct and practices with respect to mortgage procedures in the context of Chapter 13. "The public interest in openness of court proceedings is at its zenith when issues concerning the integrity and transparency of bankruptcy court proceedings are involved" as they are with respect to the escrow practices in the Debtors' cases. *Id.* at 553. Public access to the papers in the Debtors' cases will further that goal.[26]

---

information; the dissemination of merely prejudicial material cannot be enjoined under the provision.") (citations omitted).

[25]    In any case, given the outcome of the OSC in this Decision, the outcome determinative approach advocated by Ms. Tirelli would result in an unsealing of these materials.

[26]    Ms. Tirelli asserts that Section 107 "vests broad discretion in the Court to seal papers based upon the request of a party in interest" and that the Court must "analyze the presumption of public access and balance competing consideration to determine if sealing is warranted." Opp. to Trustees' Motion to Unseal Recommendation at 5, 11 (citing *Lugosch v. Pyramid Co.*, 435 F.3d 110 (2d Cir. 2010); *see also* Hr'g Tr. 33:16-21 (Sept. 14, 2022) ("I do think that the balancing of the equities in this particular instance, protecting the record and protecting the reputation of a professional outweighs the need to have the United States Trustee's Office and the Chapter 13 Trustee's Office subjective arguments laid bare in the public view because there is no downside."). But, in fact, a bankruptcy court lacks discretion when determining whether information that falls under Section 107(b) should or should not be filed under seal. *See In re Motors Liquidation Co.*, 561 B.R. at 42. "Adopted by Congress

Counsel to Ms. Tirelli admitted that he had no case law to support her preferred approach. *See* Hr'g Tr. 31:17-25, 34:6-8 (Sept. 14, 2022) (counsel suggesting the issue might be one of first impression). But as the Court noted at oral argument, it is unfortunately not uncommon for issues to be raised with this Court regarding improper conduct, whether by a professional retained in a case (legal or otherwise) or some other party to the matter. *See id.* at 34:9:15. Taking Ms. Tirelli's position to its logical conclusion, the blanket protection of such material might require the sealing of any comment made on the record—by the Court or otherwise—regarding bad behavior or possible malfeasance. Any time an attorney were to face sanctions, be it for discovery violations, violations of Fed. R. Civ. P. 11, or otherwise, a sealing request could be justified under the standard condoned by Ms. Tirelli. This would be absolutely unworkable, not to mention constituting a profoundly unsound policy.[27]

Ms. Tirelli also argues that the proceedings before this Court are akin to an attorney grievance proceeding and the Court should therefore follow the sealing rules applied by the District Court Committee on Grievances and the Connecticut Grievance Committee. But the Court disagrees. The OSC was issued to address conduct that occurred before this Court in these Chapter 13 cases. The plans in question were filed in these cases. Thus, it is appropriate for this

---

in 1978, [Section] 107 made an important change in the common law regarding public access to bankruptcy court records. It is no longer left to the bankruptcy court to balance the interests of the public and private parties in determining whether to seal records from public view." *In re Food Mgmt.*, 359 B.R. at 554; *see also In re Orion*, 21 F.3d at 27 ("[I]f the information fits any of the specified categories, the court is required to protect a requesting interested party and has no discretion to deny the application."); *cf. Law v. Siegel*, 571 U.S. 415, 421-24 (2014) (holding that in exercising its "statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions[,]" especially in circumstances where the Code contains "carefully calibrated exceptions and limitations" ). While a bankruptcy court must strictly comply with the requirements of Section 107, it does have discretion to decide how to protect information that falls within the protections of Section 107(b) and to determine the form of relief that should be granted. *See In re Motors Liquidation*, 561 B.R. at 42. But the Court has already determined that the material Ms. Tirelli seeks to have sealed does not fall within the protections of Section 107(b) and it lacks discretion to seal the information for other reasons.

[27]    Indeed, counsel to Ms. Tirelli himself admitted that the position he was advocating "perhaps may be putting the cart before the horse. . . ." Hr'g Tr. 27:1-2 (Sept. 14, 2022).

Court to make a determination of the propriety of such conduct, even if the Court ultimately

leaves the question of discipline to the entity charged with such responsibility. *See, e.g., Geltzer*

*v. Brizinova (In re Brizinova)*, 565 B.R. 488, 499 (Bankr. E.D.N.Y. 2017) (stating that S.D.N.Y.

& E.D.N.Y. United States District Court Civil Local Rules (the "Local Civil Rules") govern and

that Rule "1.5(b) addresses discipline of attorneys, and provides that the appropriate forum for

hearing and determining whether a disciplinary violation has occurred is the District Court's

Committee on Grievances."); *cf. Statewide Griev. Comm. v. Burton*, 88 Conn. App. 523, 528

(2005) (holding that courts have the power to regulate attorney conduct and discipline members

of the bar); *Luscier v. Risinger Bros. Transfer, Inc.*, 2015 WL 5638063, at *14 (S.D.N.Y. Sept.

17, 2015) ("The imposition of a sanction by an individual judge is not attorney discipline.").[28]

Nor do the same policy concerns exist with respect to the two different types of

proceedings.  On the one hand, disciplinary proceedings are generally initially kept confidential

to protect attorneys from any false or malicious grievances because any party can submit any

allegation; confidentiality exists until there is a finding of probably cause that misconduct has

occurred.  *See Field v. Kearns*, 1995 WL 216824, at *5 (Conn. Super. Ct. Apr. 3, 1995)

("Additional safeguards for attorneys who are the subject of false or malicious grievances exist

through the well-settled procedure of keeping the complaint and investigation confidential unless

---

[28]    To the extent that Ms. Tirelli relies on the case of *Robbins v. Tripp*, 510 B.R. 61 (E.D. Va. 2014) to argue for sealing on the grounds that these proceedings are disciplinary proceedings, the facts of that case are distinguishable from the situation at hand.  *See* Hr'g Tr. 7:1-7, 8:17-22 (May 3, 2022).  In *Robbins*, the court directed counsel to submit a candid report detailing a practitioner's practice before the court that was not to be written from the position as an advocate for any side involved in the matter.  *See Robbins*, 510 B.R. at 63-64.  The report submitted by the practitioner's counsel was to detail how the practitioner "operates his private practice and interacts with his clients."  *Id.* at 67 (emphasis omitted). The court specified that with respect to sealing the document it had expected counsel would not to be held to "the legal standard but to the brutally candid standard where you said or may have said things in that report in a way that you wouldn't necessarily have said in a report that was for publication as Mr. Tripp's lawyer."  *Id.* at 64.  The situation is clearly distinct from this case.  The OSC does not address Ms. Tirelli's general legal business or interactions with her clients but is limited to Ms. Tirelli's mortgage escrow practices given her representations to the Court on that subject.

and until there has been a finding of probable cause."); *see also* Conn. Super. Ct. Rule 2-32(g) ("Investigations and proceedings of the grievance panel shall be confidential unless the attorney under investigation requests that such investigation and proceedings be public.").  The procedures are similar for the District Court's Grievance Committee.  *See* Local Civil Rule 1.15(d)(3) ("Complaints, and any files based on them, shall be treated as confidential unless otherwise ordered by the Chief Judge for good cause show or in accordance with paragraph (d)(5). . . .").  In contrast, any concerns here regarding baseless allegations ignores that the Court itself issued the OSC based on the facts and circumstances of these cases.  Not surprisingly then, it is well established that trial-level proceedings on attorney conduct are considered to be public documents in Connecticut and the Southern District of New York.  *See, e.g., Prue v. Statewide Grievance Comm.*, 44 Conn. Supp. 348 (Conn. Super. Ct. 1995) (dismissing appeal of attorney charged with the taking of escrow funds); *Schwab v. Schwab*, 1993 WL 592187, at *8 (Conn. Super. Ct. Dec. 29, 1993) (referring matter to Connecticut grievance committee); *Macolor v. Libiran*, 2015 WL 1267337 (S.D.N.Y. March 18, 2015) (detailing misconduct committed by counsel during course of litigation and referring to District Court Grievance Committee).[29]

For all the reasons noted above, the Court grants the UST's Motion to Unseal.

## B.  **The Merits of the OSC**

A bankruptcy court has the inherent power, "incidental to all courts" to "discipline attorneys who appear before it."  *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991); *see also Williams v. Lynch (In re Lewis)*, 611 Fed. Appx. 134, 136 (4th Cir. 2015); *In re Nguyen*, 447 B.R. 268, 280 (9th Cir. B.A.P. 2011) (noting that bankruptcy courts "have the inherent authority

---

[29]    Ms. Tirelli cites to *Mann v. New York State Court of Appeals*, 2021 WL 1224011 (N.D.N.Y. March 31, 2021) to support her argument that this case is analogous to a grievance proceeding and should use the same sealing procedures.  But *Mann* does not deal with a case before a bankruptcy court and is inapplicable to the standard the Court must follow under Section 107 of the Bankruptcy Code.

to regulate the practice of attorneys who appear before them."). Thus, the Court has "the inherent power to sanction attorneys for misconduct that is not undertaken for the client's benefit" and "[n]o finding of bad faith is required for a court to issue sanctions in these circumstances." *In re Green*, 422 B.R. 469, 476 (Bankr. S.D.N.Y. 2010) (citing *United States v. Seltzer*, 227 F.3d 36, 42 (2d Cir. 2000) (a court "need not find bad faith before imposing a sanction under its inherent power" relating to "misconduct by an attorney that involves that attorney's violation of a court order or other misconduct that is not undertaken for the client's benefit. . . ."); *Wilder v. GL Bus Lines*, 258 F.3d 126, 130 (2d Cir. 2001) (holding that courts may use inherent power to sanction "where the attorney has negligently or recklessly failed to perform his responsibilities as an officer of the court"); *Lubit v. Chase (In re Chase)*, 372 B.R. 142, 154-55 (Bankr. S.D.N.Y. 2007)); *see also Rosellini v. United States Bankruptcy Court (In re Alba Sanchez)*, 790 F. App'x 293, 295 (2d Cir. 2019); *In re Nguyen*, 447 B.R. at 281 ("Bankruptcy courts [ ] have express authority under the Code and the Rules to sanction attorneys, including disbarment or suspension from practice."); *In re Snyder,* 472 U.S. 634, 643 (1985) (noting that inherent power of court includes the power to suspend or disbar attorneys from practicing before the court).

The Bankruptcy Code also authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [Title 11] . . . or to prevent an abuse of process." 11 U.S.C. § 105(a); *see Burd v. Walters (In re Walters),* 868 F.2d 665, 669 (4th Cir.1989) (upholding contempt sanctions under Section 105(a) of the Bankruptcy Code based on attorney's failure to disclose fees, disgorge unauthorized fees, and obtain authority to represent debtor); *Cunningham v. Ayers (In re Johnson)*, 921 F.2d 585, 586 (5th

Cir.1991) ("[B]ankruptcy courts have both statutory and inherent authority to deny attorneys and others the privilege of practicing before that bar.").

In addition to this Court's authority to discipline attorneys who appear before it, attorneys are subject to other supervision. Ms. Tirelli is a member of the bar for the State of Connecticut who is also admitted to practice in the Southern District of New York. *See* Local Civil Rule 1.3. For attorneys admitted to practice before this Court, "the appropriate forum for determining whether a disciplinary violation has occurred is the District Court's Committee on Grievances. *See In re Brizinova*, 565 B.R. at 499. The Committee on Grievances may impose discipline or other appropriate relief if it finds by clear and convincing evidence that in connection with activities before the Court, an attorney has engaged in conduct that violates the New York State Rules of Professional Conduct. *See* Local Civil Rule 1.5(b)(5). Local Civil Rule 1.3 requires that attorneys appearing in this Court "must abide by the . . . New York State Rules of Professional Conduct." *In re Brizinova*, 565 B.R. at 499 (internal citations and quotations omitted). In addition, Ms. Tirelli is subject to the rules that apply to members of the Connecticut bar.

1.  <u>The Shortfall in the Account, Comingling of Funds and Failure to Reconcile Account</u>

As a threshold matter, the Court concludes that Ms. Tirelli failed to comply with her obligations for the IOLTA account where the escrowed funds were held in these cases. The applicable rules require that an attorney with client funds in escrow must hold the funds in a separate account, not comingle the funds with other monies, and routinely reconcile such accounts.

With respect to her IOLTA trust account, for example, Rule 1.15(b) of the Connecticut Professional Rules requires that such funds be safeguarded and separated:

> (b) A lawyer shall hold property of clients or third persons that is in a lawyer's
> possession in connection with a representation separate from the lawyer's own
> property.  Funds shall be kept in a separate account maintained in the state where
> the lawyer's office is situated . . . Other property shall be identified as such and
> appropriately safeguarded.

Conn. Prof'l Rule 1.15(b).  Additionally, the Official Commentary to Connecticut Professional

Rule 1.15(b) makes clear that such funds should be segregated:

> A lawyer should hold property of others with the care required of a professional
> fiduciary. . . . All property that is the property of clients . . . must be kept separate
> from the lawyer's business and personal property, and if moneys, in one or more
> trust accounts. . . . [N]ormally it is impermissible to commingle the lawyer's own
> funds with client funds.

Commentary, Conn. Prof'l Rule 1.15(b).  Rule 1.15 of the N.Y. Professional Rules provides

similar guidance:

> (a) Prohibition Against Comingling and Misappropriation of Client Funds or
> Property.

> A lawyer in possession of any funds or other property belonging to another
> person, where such possession is incident to his or her practice of law, is a
> fiduciary, and must not misappropriate such funds or property or commingle such
> funds or property with his or her own.

> (b) Separate Accounts.

> (1) A lawyer who is in possession of funds belonging to another person incident
> to the lawyer's practice of law shall maintain such funds in a banking institution
> within New York State that agrees to provide dishonored check reports in
> accordance with the provisions of 22 N.Y.C.R.R. Part 1300. . . . Such funds shall
> be maintained, in the lawyer's own name, or in the name of a firm of lawyers of
> which the lawyer is a member . . . in a special account or accounts, separate from
> any business or personal accounts of the lawyer or lawyer's firm, and separate
> from any accounts that the lawyer may maintain as executor, guardian, trustee or
> receiver, or in any other fiduciary capacity; into such special account or accounts
> all funds held in escrow or otherwise entrusted to the lawyer or firm shall be
> deposited[.]

N.Y. Prof'l Rule 1.15(a), (b).  The Official Comment to New York Professional Rule 1.15

addresses the same concerns in providing that:

> [1] A lawyer should hold the funds and property of others using the care required of a professional fiduciary. . . . All property that is the property of clients or third persons . . . must be kept separate from the lawyer's business and personal property and, if monies, in one or more trust accounts, including an account established pursuant to the "Interest on Lawyer Accounts" law where appropriate. . . .

> [2] . . . [N]ormally it is impermissible to commingle the lawyer's own funds with client funds[.]

Comment, N.Y. Prof'l Rule 1.15.

To ensure that these important concerns are addressed, the Connecticut Professional Rules further imposes a quarterly reconciliation requirement for trust fund accounts. Subsection (j)(9) of Connecticut Professional Rule 1.15 provides that:

> (j) A lawyer who practices in this jurisdiction shall maintain current financial records as provided in this Rule and shall retain the following records for a period of seven years after termination of the representation: . . . (9) copies of monthly trial balances and at least quarterly reconciliations of the client trust accounts maintained by the lawyer.

Conn. Prof'l Rule 1.15(j)(9). The Official Commentary for Rule 1.15 notes that "[q]uarterly reconciliation is recommended only as a minimum requirement; monthly reconciliation is the preferred practice given the difficulty of identifying an error (whether by the lawyer or the bank) among three months' transactions." Commentary, Conn Prof'l Rule 1.15. While no such reconciliation requirement is imposed by the N.Y. Professional Rules, best practices suggest reconciliation on a monthly basis. *See Attorney Trust Accounts and Recordkeeping-A Practical Guide*, The New York Lawyers' Fund for Client Protection of the State of New York (April 2021) (www.nylawfund.org/prac2021.pdf, visited on Feb. 15, 2023) ("Internal office controls are essential. It is good business practice to prepare a monthly reconciliation of the balances in the trust ledger book, the trust receipts and disbursements journals, the bank account checkbook, and bank statements.").

It has been held that the failure to properly hold and safeguard client funds in an IOLTA

account violates Connecticut Professional Rule 1.15(b), even in instances where such failure was

attributable to an inadvertent bookkeeping error.  *See Off. of Chief Disciplinary Couns. v.*

*Willcutts*, 2017 WL 1901416, at *3 (Conn. Super. Ct. Apr. 11, 2017) (ordering interim

suspension of attorney for, among other things, comingling his funds with client funds, not

holding the full amount of clients' funds in IOLTA account and failing to safeguard client's

funds); *Off. of Chief Disciplinary Couns. v. Breakstone*, 2017 WL 6884023, at *3 (Conn. Super.

Ct. Dec. 1, 2017) (finding attorney in violation of Conn. Prof'l Rule 1.15 and officially

reprimanding attorney for failure to safeguard client's funds placed in his operating account due

to bookkeeping error).  Likewise, the holding of personal funds in an IOLTA account and the

comingling of funds has been found to violate Connecticut Professional Rule 1.15(b).  *See Off. of*

*Chief Disciplinary Couns. v. McCoy*, 2016 WL 7975734, at *3 (Conn. Super. Ct. Dec. 9, 2016)

(finding attorney in violation of Conn. Prof'l Rule 1.15 and ordering interim suspension for

utilizing IOLTA client funds for personal purposes, despite absence of theft or defalcation).[30]

New York law is in accord.  *See Matter of Ozimkowski*, 161 N.Y.S.3d 330, 333-34 (App.

Div. 2d Dep't 2022) (finding attorney in violation of N.Y. Prof'l Rule 1.15 and ordering

suspension of attorney for one year due to, among other things, shortfall in escrow account and

comingling of funds, despite attorney's argument that the invasion of trust funds was inadvertent

---

[30]    Connecticut courts have also imposed remedies for an attorney's failure to reconcile their IOLTA account.
*See Statewide Grievance Comm. v. Baldwin*, 2001 WL 1560895, at *4 (Conn. Super. Ct. Nov. 13, 2001) (finding
attorney in violation of Practice Book § 2-27(b) and Rules of Professional Conduct for managing client funds due to,
among other things, failure to prepare written reconciliations of trust account journals, client ledgers and bank
statements); *McCoy*, 2016 WL 7975734, at *3 (stating that attorney violations with respect to IOLTA account
constituted more than poor bookkeeping because, among other things, attorney had also failed to reconcile IOLTA
account in violation of Practice Book § 2-27); *Chief Disciplinary Counsel v. Creed*, 2014 WL 3397773, at *2 (Conn.
Super. Ct. May 30, 2014) (finding violations of Connecticut Prof'l Rule 1.15(b) and Practice Book § 2-27 for,
among other things, lack of bank reconciliations of trust account).

and had resulted in failure to maintain adequate bookkeeping records and that attorney had immediately replaced funds to correct account deficiencies ); *Matter of Lucere*, 118 N.Y.S.3d 751, 755 (2020) (finding violation of N.Y. Prof'l Rule 1.15 and publicly censuring attorney whose trust account fell below the amount she was required to maintain for several client matters, despite attorney's argument that such mismanagement was unintentional and inadvertent and did not result in harm to any client).

Applying these principles here, the Court concludes that Ms. Tirelli violated several rules in her handling of the escrow funds here. To start, Ms. Tirelli concedes that her Account had a shortfall for a period of approximately two years, from June 2019 until August 2021. Counsel to Ms. Tirelli acknowledged that the shortfall that occurred due to an earlier escrow transaction unrelated to the Debtors that caused a "bookkeeping error when there should have been two deposits for $21,300 to correlate with the two withdrawals" that totaled $42,600. *See* Hr'g Tr. 20:22-22:16 (March 24, 2022).[31] According to Ms. Tirelli's counsel, the error apparently began in June 2019, and was only remediated with a deposit in August 2021. *See id.* at 20:22-21:12; *see also id.* at 21:24-22:6 (after the Court asked to clarify that the shortfall caused by the bookkeeping error was over a two-year period, Ms. Tirelli's counsel answered, "Absolutely. Yes. The answer is yes."). Such a shortfall would appear to violate Connecticut Professional Rule 1.15(b) and N.Y. Professional Rule 1.15.[32]

---

[31]    The Court took these comments made by Ms. Tirelli's counsel at the March 24th hearing, with counsel's agreement, "as representation to the Court as to certain material facts relevant to this order to show cause, and that they've been offered in lieu of providing additional documents." Hr'g Tr. at 24:11-24 (March 24, 2022).

[32]    In addition to this longer shortfall, Ms. Tirelli does not challenge the shorter shortfall identified by the UST for funds in her Account between June and August 2021 for four Debtors: *Watson* (Case No. 18-22923), *Akerib* (Case No. 19-22276), *Cretekos* (Case No. 18-22239), and *Berger* (Case No. 17-22921). *See* Exhibit A to the UST Recommendation at 36 (exhibit consisting of a chart compiled by the UST based upon the bank statements for the Account that were provided to the Court, the UST and the Chapter 13 Trustee on an *in camera* basis in accordance with the Production Order). On May 31, 2021, the Account held a total balance $77,977.40. *See id.* at 36-38. Of this amount, $72,511.32 constituted the mortgage fund escrow deposits for the following four Debtors: (1) *Cretekos*, Case No. 18-22239 ($28,000); (2) *Watson*, Case No. 18-22923 ($8,511); (3) *Akerib*, Case No. 19-22276 ($7,200);

The facts here also strongly suggest that Ms. Tirelli had not conducted any reconciliation of the Account during this time, as she would have presumably caught the error if one had taken place. A failure to reconcile the Account for such a lengthy period of time would appear to violate Connecticut Professional Rule 1.15(g)(9). Ms. Tirelli also deposited non-client funds into the Account at least two times, suggesting the improper comingling of funds. At the hearing on March 24, 2022, Ms. Tirelli's counsel admitted that Ms. Tirelli deposited $65,000 into the Account in April 2019 and that this amount had come from a fee paid to Ms. Tirelli from an outside party. *See* Hr'g Tr. 16:2-19:16 (Mar. 24, 2022). Ms. Tirelli used these monies to fund the Account instead of waiting to transfer the escrow balance from a preceding account that Ms. Tirelli had established to transfer funds from her prior firm's trust account. *See id.* Ms. Tirelli's counsel stated that Ms. Tirelli credited those funds to the Debtors' escrow balances and that "the money was treated as fungible." *See id.* at 18:15-21. Then in August 2021, Ms. Tirelli transferred funds into the Account to cure the shortfall. *See id.* at 22:1-4. There is no evidence of where those monies came from, but the UST believes that they were personal funds of Ms. Tirelli "because after over two years of the shortfall, they were neither the funds of the four Affected Debtors, (*Watson, Akerib, Cretekos and Berger*), nor could the funds legally have been another client's funds." UST Recommendation at 31. Ms. Tirelli argues she "merely took sums equal to debtor funds and remitted into a IOLTA account and credited debtor balances, but did not merge client funds with non-client funds" and that that the "improper commingling of funds

---

and *Berger*, No. 17-22921 (holding $28,800). *See id.* On June 3, 2021, Ms. Tirelli withdrew $10,000.00 from the Account, resulting in a shortfall of funds held in escrow for the four Debtors in the amount of $4,533.92. *See* Exhibit A to the UST Recommendation at 36. The Court issued the OSC on June 17, 2021. *See generally* OSC. By June 30, 2021, the shortfall in the Account had increased to $24,440. *See* Exhibit A to the UST Recommendation at 36. On that date, the Account's balance was $48,071.17, but the amount of mortgage funds deposited by the four Debtors was still $72,511.32. *See id.* As of July 31, 2021, the Account still had a shortfall of $24,440.15. *See id.* On August 11, 2021, the shortfall ended when Ms. Tirelli deposited $30,000 of funds into the Account. *See id.*

involves the failure to maintain client or other third-party funds in a separately designated account."  *See* Tirelli Opposition ¶¶ 69-70.

2.  Ms. Tirelli's Representations to the Court

As for the broader question of whether Ms. Tirelli's representations to the Court constituted misconduct, the Court concludes that Ms. Tirelli lacked candor with the Court in her repeated representations to the Court about the escrowing of proceeds in these cases.

"An attorney is an officer of the court and owes the court fiduciary duties and loyalty."  *RCI HV, Inc. v. Transtec (RC) Inc.*, 2004 WL 1197246, at *11 (S.D.N.Y. May 28, 2004) (internal citation omitted); *see also Syntel Sterling Best Shores Mauritius Limited v. TriZetto Group*, 328 F.R.D. 100, 118 (S.D.N.Y. 2018).  "Moreover, attorneys owe an ethical duty of candor in all of their dealings with the Court."  *Id.* (citing *Mason Agency Ltd. v. Eastwind Hellas SA*, 2009 WL 3169567, at *2 (S.D.N.Y. Sept. 29, 2009) ("The rules of professional responsibility . . . impose upon attorneys a duty of candor in all representations they make before a tribunal.")); *see also ST Shipping and Transport, Inc. v. Golden Fleece Maritime Inc.*, 2008 WL 4178189 (S.D.N.Y. Sept. 9, 2008) ("As officers of the court, attorneys maintain a duty of honesty in all proceedings.") (citing N.Y. Disciplinary Rule 7-102(A)(5); Model Rules of Prof'l Conduct R. 3.3)).

Rule 8.4 of the Connecticut Rules of Professional Conduct ("Connecticut Professional Rules") provides that "[i]t is professional misconduct for a lawyer to: (1) Violate or attempt to violate the Rules of Professional Conduct."  Conn. Prof'l Rule 8.4(1).  Under Connecticut Professional Rule 8.4, misconduct includes: "(3) Engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation; [and] (4) Engag[ing] in conduct that is prejudicial to the administration of justice."  Conn. Prof'l Rule 8.4(3), (4).

Similarly, Rule 8.4 of the New York Rules of Professional Conduct (the "N.Y.

Professional Rules") provides that "[a] lawyer or law firm shall not: (a) violate or attempt to

violate the Rules of Professional Conduct . . .; (c) engage in conduct involving dishonesty, fraud,

deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of

justice. . . ."  N.Y. Prof'l Rule 8.4 (a), (c), (d).  Additionally, a failure to disclose material facts

to the Court may constitute a fraud upon the Court.  *See Trehan v. Von Tarkanyi*, 63 B.R. 1001,

1006 n.8 (S.D.N.Y. 1986) ("When an attorney misrepresents or omits material facts to the court,

or acts on a client's perjury or distortion of evidence, his conduct may constitute a fraud on the

court.") (citing *H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.,* 536 F.2d 1115, 1119 (6th

Cir. 1976) (stating that attorney's knowledge and sponsorship of client's nondisclosure,

misrepresentation and perjury would constitute a fraud on the court); *Kupferman v. Consolidated

Research & Manufacturing Corp.,* 459 F.2d 1072, 1078 (2d Cir. 1972) (stating that attorney's

failure to disclose the existence of a release which he knew was a full defense to plaintiff's claim

would fit within the concept of fraud on the court); *Bulloch v. United States,* 95 F.R.D. 123 (D.

Utah 1982) (finding fraud on the court where the government and its attorneys made false and

deceptive representations, withheld information, and pressured witnesses not to testify)).  A court

may sanction an attorney for misrepresentation pursuant to its inherent authority.  *See Karsch v.

Blink Health Ltd.*, 2019 WL 2708125, at *14 n.13 (S.D.N.Y. June 20, 2019) ("The court's

inherent authority is often cited as the 'primary basis' for sanctions where a party or its counsel

has made misrepresentations to the court.") (citing *Jung v. Nechis*, 2009 WL 762835, at *13

(S.D.N.Y. Mar. 23, 2009)).

It is undisputed that funds were not escrowed in six of the cases identified in the OSC—

despite representations in the Chapter 13 plans—and that there were shortfalls in the escrowed

funds in another four cases.  In assessing Ms. Tirelli's conduct, it is crucial to understand the
central role that a Chapter 13 plan plays in the administration of the case.  The Bankruptcy Code
requires that a Chapter 13 plan is filed at the beginning of the case.  *See* Fed. R. Bankr. P.
3015(b) ("The debtor may file a [C]hapter 13 plan with the petition.  If a plan is not filed with
the petition, it shall be filed within 14 days thereafter, and such time may not be further extended
except for cause shown and on notice as the court may direct.").  It is a living document that
controls the case going forward.  As one practitioner handbook describes it for debtors:

> Your Chapter 13 plan is the most important document in your bankruptcy case
> and it will control your financial life while your bankruptcy is pending.  The plan
> tells the court and your creditors how you intend to repay your debts, including
> the total amount you will pay each month, how much each creditor will receive
> under your plan, and how long your plan will last.

Cara O'Neill, Chapter 13 Bankruptcy at 140 (Nolo 14th ed. May 2018).

The Bankruptcy Code gives immediate effect to a plan that has been filed.  A debtor shall
start making payments in the amount set forth in the plan to the Chapter 13 Trustee not later than
30 days after the filing of the plan.  *See* 11 U.S.C. § 1326(a)(1).  Section 1326 also requires
payments that provide adequate protection to secured creditors.  *See* 11 U.S.C. § 1326(a)(1)(C).
The standard form Chapter 13 plan in this Court provides that debtors make postpetition
contractual installment payments on secured claims directly to the secured creditor.  *See* Form
Chapter 13 Plan, Section 3.1(a), available at http://www.nysb.uscourts.gov/chapter-13-filing-
and-plan-information, last visited March 2, 2023.  The plan is so central to the functioning of
Chapter 13 cases that "[t]he failure to commence plan payments when required can be cause for
dismissal or conversion of the [C]hapter 13 case under [S]ection 1307(c)(4)."  Collier on
Bankruptcy, ¶ 1326.02[1][a] (16th ed. 2023); *cf. United Student Aid Funds, Inc. v. Espinosa*, 559
U.S. 260 (2010) (giving effect to a confirmed plan notwithstanding its erroneous inclusion of a

provision to discharge student debt).[33]  In submitting the Chapter 13 plans in these cases, Mr.

Tirelli signed all but one of the plans as counsel to each of the individual debtors.[34]

---

[33]     Of course, a debtor may file an amended plan before confirmation and even seek to alter the terms of a
confirmed plan under certain limited circumstances.  *See* 11 U.S.C. § 1323; 11 U.S.C. § 1329.  But none of that
changes the significance of a filed plan as the operative document in the case prior to confirmation, as its terms set
the stage for all the actions in the case going forward.

[34]     All but one of the plans was signed by both the Debtor and Ms. Tirelli as Debtor's counsel.  For the one
case in which Ms. Tirelli did not sign the plan, she appeared not as main bankruptcy counsel, but as litigation
counsel and the plan provided for escrow payments to her firm's account:

- *In re Justo Reyes*, Case No. 16-22556, Chapter 13 Plan at 10 [ECF No. 13] (Chapter 13 plan signed by both
  the Debtor and Ms. Tirelli as attorney for Debtor on May 5, 2016);
- *In re Karen Jackson*, Case No. 16-23514, Chapter 13 Plan at 10 [ECF No. 4] (Chapter 13 plan signed by
  both the Debtor and Ms. Tirelli as attorney for Debtor on November 2, 2016);
- *In re Janet Berger*, Case No. 17-22921, Chapter 13 Plan at 10 [ECF No. 22] (Chapter 13 plan signed by
  both the Debtor and Ms. Tirelli as attorney for Debtor on September 1, 2017);
- *In re Anastasia Cretekos*, Case No. 18-22239, Chapter 13 Plan at 9 [ECF No. 8] (Chapter 13 plan signed by
  both the Debtor and Ms. Tirelli as attorney for Debtor on February 23, 2018);
- *In re Frank Occhipinti*, Case No. 18-22690, Chapter 13 Plan at 9 [ECF No. 11] (Chapter 13 plan signed by
  the Debtor without date and by Ms. Tirelli as attorney for Debtor on May 24, 2018);
- *In re Richard Graham Watson*, Case No. 18-22923, Chapter 13 Plan at 9 [ECF No. 9] (Chapter 13 plan
  signed by the Debtor without date and by Ms. Tirelli as attorney for Debtor on June 26, 2018);
- *In re Douglas Kramer*, Case No. 18-22940, Chapter 13 Plan at 9 [ECF No. 10] (Chapter 13 plan signed by
  the Debtor on June 29, 2018 and by Ms. Tirelli as attorney for Debtor without date);
- *In re Charmaine J. Brown*, Case No. 18-23036, amended Chapter 13 Plan at Section 8.6 [ECF No. 20]
  (Chapter 13 plan signed by lead bankruptcy counsel, but provides for postpetition mortgage payments to
  "be held in escrow with Tirelli & Wallshein, LLP pending judicial determination as to nature and extent of
  lien (if any) and identity of real party in interest" with Ms. Tirelli having filed a *Notice of Appearance as
  Litigation Counsel* [ECF No. 19] in the case);
- *In re Janice K. Desmond*, Case No. 18-23750, Chapter 13 Plan at 9 [ECF No. 12] (Chapter 13 plan signed
  by both the Debtor and Ms. Tirelli as attorney for Debtor on December 11, 2018);
- *In re Suzanne M. Faupel*, Case No. 19-22007, Chapter 13 Plan at 9 [ECF No. 11] (Chapter 13 plan signed
  by both the Debtor and Ms. Tirelli as attorney for Debtor on January 18, 2019);
- *In re Christopher Rocco Gizzo*, Case No. 19-22051, Chapter 13 Plan at 9 [ECF No. 9] (Chapter 13 plan
  signed by both the Debtor and Ms. Tirelli as attorney for Debtor on January 23, 2019);
- *In re John Kolkowski*, Case No. 19-22172, Chapter 13 Plan at 9 [ECF No. 10] (Chapter 13 plan signed by
  both the Debtor and Ms. Tirelli as attorney for Debtor on February 14, 2019);
- *In re Catherine R. Pelle*, Case No. 19-22229, Chapter 13 Plan at 9 [ECF No. 7] (Chapter 13 plan signed by
  both the Debtor and Ms. Tirelli as attorney for Debtor on February 23, 2019);
- *In re David Daniel Akerib*, Case No. 19-22276, Chapter 13 Plan at 9 [ECF No. 11] (Chapter 13 plan signed
  by the Debtor on March 4, 2019 and by Ms. Tirelli as attorney for Debtor on March 12, 2019);
- *In re Sarah Frankel*, Case No. 19-22281, Chapter 13 Plan at 9 [ECF No. 8] Chapter 13 plan signed by both
  the Debtor and Ms. Tirelli as attorney for Debtor on March 4, 2019);
- *In re Malka Farkas*, Case No. 19-22520, Chapter 13 Plan at 9 [ECF No. 10] (Chapter 13 plan signed by the
  Debtor without date and by Ms. Tirelli as attorney for Debtor on March 26, 2019);
- *In re Blossom Joyce Consingh*, Case No. 19-23034, Chapter 13 Plan at 9 [ECF No. 24] (Chapter 13 plan
  signed by both the Debtor and Ms. Tirelli as attorney for Debtor on August 6, 2019).

The Chapter 13 plans filed by Ms. Tirelli in these cases altered the normal rules by not paying postpetition mortgage funds to the secured creditor directly or through the Chapter 13 Trustee.[35]  More specifically, Ms. Tirelli altered the form Chapter 13 plan by providing in the "Nonstandard Plan Provisions" section that she would serve as escrow agent for postpetition mortgage payments or that such payments were to otherwise be set aside in cases where the validity of the relevant mortgage was disputed.  *See supra*, n.3.  These postpetition payments were also listed in Schedule J of the Debtors' Schedules of Assets and Liabilities, and were thereby specifically represented to be an ongoing expense to each of the Debtors.[36]  As Debtors' counsel, Ms. Tirelli would have been aware that by not following the escrow procedures, these funds would have been freed up for use by the Debtors instead of being captured as disposable income that should have been used for the payment of creditors.

---

[35]     There are generally two ways that postpetition mortgage payments are made through Chapter 13 plans.

> Section 1326(c) [of the Bankruptcy Code] requires that the [C]hapter 13 trustee serve as the disbursement agent, making payments to creditors under the plan unless the plan or confirmation order provides otherwise.  Courts have long understood the statutory language as giving the court discretion whether to allow a debtor to propose a plan where the debtor makes certain payments directly to creditors.  Such a plan is known as a 'direct payment plan' and most often arises in the context of payments to mortgage holders.  In contrast, a 'conduit plan' is a [C]hapter 13 plan where the debtor's mortgage obligation is part of the debtor's monthly [C]hapter 13 plan payment, and the trustee passes through to the mortgage holder that portion of the [C]hapter 13 payment that represents the amount the debtor owes on the mortgage.

Final Report of the ABI Commission on Consumer Bankruptcy 2017-2019, § 4.06 (American Bankruptcy Institute 2019).

[36]     *See In re Justo Reyes*, Case No. 16-22556 [ECF No. 14]; *In re Karen Jackson*, Case No. 16-23514 [ECF Nos. 1, 129]; *In re Janet Berger*, Case No. 17-22921 [ECF Nos. 15, 42]; *In re Anastasia Cretekos*, Case No. 18-22239 [ECF No.7]; *In re Frank Occhipinti*, Case No. 18-22690 [ECF Nos. 9, 43]; *In re Richard Graham Watson*, Case No. 18-22923 [ECF Nos. 7, 62]; *In re Douglas Kramer*, Case No. 18-22940 [ECF No. 8];  *In re Charmaine Brown*, Case No. 18-23036 [ECF No. 1]; *In re Janice Desmond*, Case No. 18-23750 [ECF No. 10]; *In re Suzanne Faupel*, Case No. 19-22007 [ECF No. 10]; *In re Christopher Rocco Gizzo*, Case No. 19-22051 [ECF No. 7]; *In re John Kolkowski*, Case No. 19-22172 [ECF No. 8]; *In re Catherine Pelle*, Case No. 19-22229 [ECF Nos. 5, 37, 47, 94]; *In re David Daniel Akerib*, Case No. 19-22276 [ECF Nos. 9, 91]; *In re Sarah Frankel*, Case No. 19-22281 [ECF No. 7]; In re Malka Farkas, Case No. 19-22520 [ECF No. 8]; In re Malka Farkas, Case No. 19-22520 [ECF No. 8]; In re Blossom Joyce Consingh, Case No. 19-23034 [ECF No. 13, 25, 51].

Thus, the plan language here had a direct impact on the administration of the Debtors'

bankruptcy cases.  First, it impacted the rights and conduct of secured creditors with mortgages

on the Debtors' homes by telling them—sometimes incorrectly— that mortgage payments were

being made.  By so doing, it discouraged secured creditors from seeking relief under Section

362(d)(1) of the Bankruptcy Code, which provides that a court may grant relief from the

automatic stay "for cause, including a lack of adequate protection of an interest in property. . . ."

11 U.S.C. § 362(d)(1) (court shall grant relief from the automatic stay for cause).  "[T]he failure

to make mortgage payments constitutes 'cause' for relief from the automatic stay and is one of

the best examples of a 'lack of adequate protection' under Section 362(d)(1) of the Bankruptcy

Code."  *In re Schuessler*, 386 B.R. 458, 480 (Bankr. S.D.N.Y. 2008); *see also Campora v. HSBC*

*Bank USA, N.A. (In re Campora)*, 2015 WL 5178823, at *5 (E.D.N.Y. Sept. 3, 2015) ("A

debtor's failure to make postpetition mortgage payments constitutes sufficient cause to modify an

automatic stay."); *In re Elmira Litho, Inc.*, 174 B.R. 892, 903 (Bankr. S.D.N.Y. 1994) ("Without

quantifying the decline in value, the creditor can often establish its *prima facie* case by

demonstrating that the debtor has completely failed, or substantially failed, to make post-petition

payments.").  With the representation that postpetition mortgage payments were being escrowed,

secured creditors had every reason to believe that their rights were being adequately protected.

Thus, such secured creditors would have little reason to file a motion for relief from the

automatic stay, even in those cases where no payments were actually being made.

This plan provision also impacted unsecured creditors.  When disposable income is not

being used to pay secured creditors as adequate protection, it is to be paid to the Chapter 13

Trustee and thereby distributed to unsecured creditors through the Debtors' plans of

reorganization under Section 1325 of the Bankruptcy Code.  *See* 11 U.S.C. § 1325(b)(1)(B) ("If

the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan,

then the court may not approve the plan unless, as of the effective date of the plan . . . the plan

provides that all of the debtor's projected disposable income to be received in the applicable

commitment period beginning on the date that the first payment is due under the plan will be

applied to make payments to unsecured creditors under the plan.").[37]

As a highly competent and seasoned bankruptcy practitioner with numerous Chapter 13

cases before this Court, Mr. Tirelli was well aware of these consequences in representing that the

postpetition mortgage payments were being escrowed.  As a seasoned practitioner, she was also

cognizant that, as setting herself up as the escrow agent, she was putting herself in the unique

position of being the only party who would know if such payments were not being escrowed as

was being represented in the plans filed in the Debtors' cases.  The secured creditors, the Chapter

13 Trustee and the Court would have to rely on Ms. Tirelli to be as good as her word.  And she

was not.

Moreover, when the Chapter 13 Trustee and the Court began to grow concerned about the

issue, Ms. Tirelli continued to represent that all was well with the escrow protocol.  *See, e.g., In

re Akerib*, Case No. 19-22276, Hr'g Tr. 6:9-17 (Aug. 28, 2019) [ECF No. 29] (Ms. Tirelli noting

that she could not file litigation because the parties were in loss mitigation and stating, "So the

money is safe.  It is in escrow.  I can certainly give the trustee an accounting.  And it's either

going to go to help maybe put a down payment towards this, you know, loss mit. . . . Or, if not,

it will be turned over to the trustee."); *In re Jackson*, Case No. 16-23514, Hr'g Tr. 5:2-6 (May 8,

2019) [ECF No. 142] (in response to Court's inquiry as to whether postpetition payments were

---

[37]    To put a more practical point on it, there are instances when a Chapter 13 debtor might decide to no longer keep his or her primary residence and thus stop making postpetition mortgage payments.  In such circumstances, those funds would available as a potential source of recovery for unsecured creditors, after first subtracting any appropriate cost for providing housing to the debtor.

being made to the secured creditor on the property, Ms. Tirelli stating, "No, Your Honor, that

money would be set aside."); *In re John Kolkowski*, Case No. 19-22172, Hr'g Tr. 13:5-12, 15:18-

22 (Aug. 19, 2020) [ECF No. 30] (Ms. Tirelli noting that with regard to postpetition payments,

varying provision of plan provided for those payments to be deposited in Ms. Tirelli's escrow

account and that there were no issues with turning that money over, because "[t]hat's why it was

set aside and earmarked for that purpose."). The Court, the Chapter 13 Trustee and other

interested parties relied in good faith on these and similar representations by Ms. Tirelli, trusting

that in the cases where Ms. Tirelli used the escrow procedures she was ensuring that the process

set forth in the plan was being followed and the case was being monitored.

In the face of requests for more detailed information about the status of the escrowed

funds, Ms. Tirelli repeatedly delayed in providing information. In hearing after hearing, this

information was not provided, with no affirmative follow-up with the Court regarding the

requested information. For instance, in the case of *Christopher Gizzo*, Case No. 19-22051, the

inquiries regarding the status of postpetition mortgage payments began at a hearing held on

March 11, 2020. *See generally* Hr'g Tr. (March 11, 2020) [Case No. 19-22051, ECF No. 100].

At that hearing, Ms. Tirelli admitted that she was not holding any funds in escrow, but noted that

she would check with her client to see if he was setting money aside. *See id.* at 3:10-18. At the

next hearing on September 11, 2020, counsel to the secured creditor raised the question of

whether Ms. Tirelli was holding any funds, and the Chapter 13 Trustee also noted that those

monies were being included on Schedule J. *See* Hr'g Tr. 2:19-3-19 (Sept. 11, 2020) [Case No.

19-22051, ECF No. 99]. Ms. Tirelli said that she had understood her client to be paying the

secured creditor directly and that she would have to follow-up with her client. *See id.* at 4:1-

5:10. The Court noted its displeasure with the fact that the plan provisions were not being

followed and Ms. Tirelli then assured the Court that she would figure out what was happening. *See id.* at 5:2-6:2. At the hearing on March 3, 2021, an associate of Ms. Tirelli's appeared and counsel to the Chapter 13 Trustee again raised the question of whether postpetition payments were being made, but no one could provide any information and counsel to the secured creditors stated that they would inquire with their client to see if they could ascertain any information. *See* Hr'g Tr. 4:13-5:10 (March 3, 2021) [Case No. 19-22051, ECF No. 98]. Finally, at a hearing on June 2, 2021, the associate of Ms. Tirelli appeared again and when asked, stated that Ms. Tirelli was not holding funds in escrow, at which point the Court noted that it was issuing the OSC and that this case would be included in that inquiry. *See* Hr'g Tr. 2:7-3:2 (June 2, 2021) [Case No. 19-22051, ECF No. 87].

Another case in which multiple inquiries were made by the Court and the Chapter 13 Trustee was the above-captioned case of *Karen Jackson*, Case No. 16-23514. At a hearing held on May 8, 2019, Ms. Tirelli and the Court engaged in a discussion regarding the Court's reticence regarding the escrow procedures and the need to continue making postpetition payments to secured creditors. *See* Hr'g Tr. 5:2-7:17 (May 8, 2019) [Case No. 16-23514, ECF No. 142]. The Court inquired as to whether postpetition payments were being made on the property in question and Ms. Tirelli unequivocally responded, "No, Your Honor, that money would be set aside." *See id.* at 5:2-6. When the Court specifically asked Ms. Tirelli how much was being held in escrow, to which Ms. Tirelli responded that she didn't have an answer for the Court "because I wasn't here for that." *See id.* at 5:23-6:2. Ms. Tirelli requested the opportunity "to come back with accounting of the post-petition payments that are being held aside," to which the Court acquiesced. *See id.* at 6:16-19. At a subsequent discussion at a hearing in January 20, 2021, the Chapter 13 Trustee also expressed concerns and requested that Ms. Tirelli's associate

appearing on her behalf look into whether money was being escrowed. *See* Hr'g Tr. 3:7-10 (Jan.

20, 2021) [Case No. 16-23514, ECF No. 170]. Yet another response was given to the Court at a

hearing on March 17, 2021 by Ms. Tirelli's associate counsel that she would inquire about the

escrow and provide that information at the hearing scheduled for the next month. *See* Hr'g Tr.

4:25-5:11 (March 17, 2021) [Case No. 16-23514, ECF No. 141]. Finally, over two years after

the Court made its original inquiry regarding whether payments were being escrowed, an answer

was given to the Court at a hearing on June 20, 2021 that the Debtor had in fact been making

adequate protection payments directly to the secured creditor. *See* Hr'g Tr. 2:14-19 (June 2,

2021) [Case No. 16-23514, ECF No. 166].[38]

   In sum, the representation in the Debtors' plans about the escrowing of these funds was

clearly inaccurate in numerous cases and something that Ms. Tirelli would have reason to know

was the case given the facts here. To the extent that her knowledge cannot be inferred from the

facts already discussed—and the Court believes that it can—there is one particular case that

confirms that Ms. Tirelli knew the inaccuracy of her representations as to the escrow of funds.

In the case of *Janice Desmond*, Case No. 18-23750, the Debtor asserted that when she told Ms.

Tirelli that she did not have the money to put into escrow, Ms. Tirelli's response was "don't

worry about it, we'll talk about it again." Hr'g Tr. 6:3–5 (Oct. 20, 2021) [Case No. 18-23750,

ECF No. 99]. The Debtor added, "And I'll be honest with you, I never thought about it again,

and I never heard anything from Ms. Tirelli about it, that I still need to start putting money in

there." *Id.* at 6:5–7. By failing to amend the plans or bring to the Court's attention that the

escrow procedure set out in the plans was not working as envisioned, this Court was purposely

---

[38]   Of course, it is proper for such payments to be made directly to the secured creditor and the Court would
not have issued the OSC here if that was the situation in all of these cases, even though it would have been
inconsistent with the representations made to the Court in the Debtors' plans.

kept in the dark.  The totality of the record clearly demonstrates that the problem here was not one of inadvertent mistake.

Ms. Tirelli argues that she did not ever directly lie to the Court.  *See* Hr'g Tr. 25:6-8, 25:17-19 (Sept. 14, 2022) ("[T]here is no specific mandate or directive which is claimed to have been violated by Ms. Tirelli. . . . Ms. Tirelli never once made a record presentation that is deemed or even accused of being false or inaccurate."); *see id.* at 30:14-18 ("The United States Trustee and the Chapter 13 Trustee have now articulated a position that Ms. Tirelli has asserted material misstatements of fact to the Court without any semblance of evidence, no directive to review the record in a certain instance.").  But Ms. Tirelli understands her obligations too narrowly.  "An attorney is not obligated merely to not outright lie to the Court; [s]he owes the Court a duty of candor.  Candor is not the state of simply not lying; candor is the quality of being open and honest in expression.  An attorney cannot excuse [her] lack of candor by pointing [out] that [s]he did not technically lie."  *In re Reed*, 2016 WL 11780171, at *116 (Bankr. E.D. Mo. Apr. 20, 2016).  In reading her obligations so narrowly, Ms. Tirelli advocates for an unworkable system for reasons one court has explained:

> [t]he obligation of an attorney to be candid with the Court is a particularly important one.  The Court relies on attorneys being candid.  If the Court had to put an attorney under penalty-of-perjury oath every time he came inside the bar, the administration of justice would come to a grinding halt.  The Court does not have the time or resources to double-check the representations of attorneys—to make sure they are not trying to sneak-one-past the Court.  There must be the baseline assumption that the attorney is not trying to dupe the Court.  In addition, this is a self-regulating profession.  Attorneys are expected to embrace the *highest* standard for their behavior to preserve the integrity of the profession.  The standard of acceptable behavior is never whatever 'just skates under' the threshold for perjury.

*Id*. (emphasis in original).

Ms. Tirelli also argues that her ethical obligations prevented her from volunteering information to the Court when the Debtors were not making payments into escrow.[39]  But the Court categorically rejects this argument for several reasons.  As a threshold matter, the Court rejects the notion that the payment—or lack of payment—to creditors in a bankruptcy is covered by the attorney-client privilege.  Indeed, it cannot be so.  Transparency as to the financial affairs of the debtor is essential to the appropriate functioning of the bankruptcy system.  By extension, the provisions in the Debtors' plans here that address payment of secured creditors—and the related question of whether such provisions were being followed—are not covered by attorney-client privilege.  They are facts in a document voluntarily submitted to the Court in a publicly filed case.

In any event, the Court rejects Ms. Tirelli's position for another reason:  in holding money in escrow for individuals who were bankruptcy debtors, Ms. Tirelli was not acting in the capacity of an attorney, but rather in the non-legal capacity of an escrow agent for those funds.  Indeed, it is well established that "an attorney's actions as an escrow agent do not implicate the attorney-client privilege." *Raspberry Junction Props. LLC v. Edwards Fa. P'ship LP*, 2019 WL 2602871, *1 (D. Conn. June 25, 2019); *see also Harris v. United States*, 413 F.2d 316, 320 (9th Cir. 1969) (bank records and checks are not confidential communications and are not subject to the attorney-client privilege); *United States v. Huberts*, 637 F.2d 630, 640 (9th Cir. 1980) (no privilege attaches to relationship between attorney and client where client functions as business agent); *Randy Int'l Ltd. v. Automatic Compactor Corp.*, 412 N.Y.S.2d 995, 998 (N.Y. Civ. Ct. 1979) (privilege does not apply to information about whether money held in escrow).

---

[39]     Ms. Tirelli admits that she did not volunteer information with respect to her clients' failure to escrow payments, arguing that her ethical obligations prevented such disclosures.  *See* Attorney Declaration ¶¶ 14-15 ("Ethical considerations precluded the undersigned from volunteering the fact that a particular Debtor/Client had not made certain payments to the undersigned.  As counsel to any Debtor, the undersigned cannot act in a manner contrary to the client's interest.  However, in any instance in which the Court or any interested party made inquiry, full and correct information was immediately provided.").  But Ms. Tirelli did not make the Court aware of that position when the Court made repeated inquiries into the escrow situation.

To the extent that Ms. Tirelli's duties as an escrow agent created tension with her duties as counsel, the Court has little sympathy as this was a conundrum that she put upon herself. The role of escrow agent was not thrust upon Ms. Tirelli; she suggested the idea of volunteering to hold these funds in escrow and took on that role voluntarily. Indeed, she fought for that role when the wisdom of the practice was challenged, insisting that all parties were protected by virtue of the escrow process. By positioning herself in the role of attorney and of escrow agent, Ms. Tirelli created her own ethical dilemma. And even if Ms. Tirelli felt that her ethical duties to her clients prevented her from bringing to the attention of the Court or the Chapter 13 Trustee that payments were not being escrowed, nothing prevented Ms. Tirelli from amending these plans to remove the escrow language and resolve any problem. Indeed, Section 1323(a) of the Bankruptcy Code permits modification of a plan at any time prior to confirmation and Debtors will file amended plans as the facts of the case change. *See* 11 U.S.C. § 1323(a). "One common reason for modifying a [C]hapter 13 plan is a change in circumstances making it impossible for the debtor to carry out the terms of the original, or prior, plan. Thus, a plan may have to be modified to permit the debtor to cure a postpetition arrearage in mortgage payments or in payments to the tree or some other default on the prior plan." Collier on Bankruptcy ¶ 1323.02 (16th ed. 2023). Having been the author of this practice and having been aware that it wasn't being followed, Ms. Tirelli should have addressed this situation with the Debtors, the Court and the Chapter 13 Trustee so that these cases could have been properly administered.

## **CONCLUSION**

For the reasons set forth above, the Court grants the Motion to Unseal as it concludes that none of the material at issue here satisfies the requirements for sealing. The Court directs that any pleadings submitted under seal by the parties in these proceedings shall be filed by the parties on the public docket forthwith. The Court further directs that any transcript of hearings in

these proceedings that has been filed under seal shall be filed on the public docket by the Clerk

of the Court.

Given the findings set forth above, the Court concludes the merits of this Order to Show

Cause by referring Ms. Tirelli to the Committee on Grievances for the United States District

Court, S.D.N.Y. for any further investigation that the Committee might deem appropriate[40] and

for the imposition of any appropriate punishment.[41]  Until proceedings are concluded before the

Committee, the Court requires that Ms. Tirelli provide a copy of this Memorandum of Decision

to any judge presiding over any case where Ms. Tirelli is acting as counsel to a bankruptcy

debtor.  Such a step will ensure that the judge in any existing or future case is put on notice of the

issues that arose in these cases so that the judge may take whatever protective action they deem

appropriate, including but not limited to imposing requirements regarding the reporting and

reconciliation of escrow balances.  Such a step is appropriate to protect the integrity of the

judicial process and any parties that appear before the Bankruptcy Court in current or future

proceedings.  *See Kramer v. Mahia (In re Khan)*, 488 B.R. 515, 527 (Bankr. E.D.N.Y. 2013)

("[T]he bankruptcy court may decide a sanctions motion because it 'directly affect[s] the

integrity of [the debtor's] bankruptcy proceedings.'") (quoting *Solow v. Kalikow (In re Kalikow)*,

602 F.3d 82, 91 (2d Cir. 2010)); *see also Creed*, 2014 WL 3397773, at *2 ("The trial court has

---

[40]     The Court notes that it has examined the circumstances of the cases identified in the OSC, with a particular
emphasis on the cases that remained open during the lengthy course of the OSC.  But the Chapter 13 Trustee
conducted an analysis of all cases where it believes that the plan provided for the escrow of funds district wide.
Chapter 13 Trustee Recommendations ¶ 10 (stating its belief that "Counsel's escrow practice was district wide and
not isolated to the cases captioned here.").  The Chapter 13 Trustee contends that the amount of funds that should
have been set aside in those cases—either by escrow or otherwise—totaled more than $2 million. *Id.* ¶¶ 10-11.  Not
having conducted such a district wide examination, the Court takes no view on the merits of such an allegation but
believes that the matter may be appropriate for further examination.

[41]     While the UST requested that this matter be referred to both the Committee on Grievances for the United
States District Court, S.D.N.Y. and to the Connecticut State Bar, the Court believes that a dual referral would create
the potential for confusion and unnecessary duplication of effort.  Given that the conduct in question occurred in
cases in the Southern District of New York, the Court concludes that a referral to the Committee on Grievances is
the most appropriate course of action.

the discretion to determine what sanction, if any, to impose for the violation by an attorney of his

professional obligations. . . . The purpose of any sanction is to safeguard the administration of

justice and protect the public from misconduct, not to punish the attorney.") (citing *Statewide*

*Grievance Committee v. Shluger,* 230 Conn. 668, 674, 678 (1994)).

      **IT IS SO ORDERED.**

Dated: White Plains, New York
      April 28, 2023

                  */s/ Sean H. Lane*
                  UNITED STATES BANKRUPTCY JUDGE